NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 230131-U

NO. 4-23-0131

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 23, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* A.H., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
| Petitioner-Appellee, | ) | No. 22JA121 |
| v. | ) | |
| Lerin H., | ) | Honorable |
| Respondent-Appellant). | ) | Dwayne A. Gab, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Lannerd and Knecht concurred in the judgment.

**ORDER**

¶ 1     *Held*: The order adjudicating the minor neglected was affirmed where the judgment was
        not against the manifest weight of the evidence.

¶ 2     Respondent, Lerin H., appeals orders (1) adjudicating her minor son, A.H.,
neglected, (2) making A.H. a ward of the court, and (3) transferring A.H.'s custody and
guardianship to the Illinois Department of Children and Family Services (DCFS). Respondent
argues only that the adjudicatory order was against the manifest weight of the evidence. She does
not challenge the dispositional order. For the reasons that follow, we affirm.

¶ 3                              I. BACKGROUND

¶ 4     Respondent gave birth to A.H. in March 2022. A.H.'s father has not been identified
in these proceedings. On May 23, 2022, the State filed a petition alleging that A.H. was a neglected
minor for two reasons. The first was that A.H. was "not receiving the proper care and supervision

necessary for his wellbeing in that mother failed to make a proper care plan for the minor's supervision." The second was that A.H.'s environment was injurious to his welfare, "as evidenced by mother's mental instability."

¶ 5   The record does not contain a transcript of the shelter-care hearing. However, an order indicates the trial court held such a hearing and determined there was probable cause to believe A.H. was neglected. The court granted DCFS temporary custody and guardianship of A.H.

¶ 6                    A. The Adjudicatory Hearing

¶ 7   The trial court began the adjudicatory hearing on October 20, 2022. Respondent interrupted the proceedings shortly after the State began its direct examination of its first witness. Some of respondent's comments, such as mentioning her first and second amendment rights, did not seem pertinent to the proceedings. Respondent continued to speak over the court. Respondent's counsel stated it had been a traumatic day for respondent, as she was just taken into federal custody on criminal charges. Respondent then said she would be quiet, and the State continued its direct examination. Shortly thereafter, respondent's counsel moved to continue the hearing. As respondent spoke over other people—for example, by asserting that she could not "carry this baby" and that she had "no life" ahead of her—the court granted the motion to continue.

¶ 8   The trial court restarted the adjudicatory hearing from the beginning on November 17, 2022. At the start of the hearing, respondent was present in court and in custody. During the proceedings, respondent requested to proceed *pro se*. The court informed respondent she had the right to represent herself, and the court asked respondent about her grievances against her counsel. Respondent said she was not a threat to A.H. or anyone else. The court told respondent it was not time for her to testify. Respondent then complained about the "back and forth" nature of the proceedings. The court told respondent there was a procedure that needed to be followed.

Respondent then said she felt that "all the evidence used against" her was "not really admissible in court." The court denied respondent's request to represent herself, determining she did not understand how the proceedings worked. Thereafter, the court was unable to stop respondent from disrupting her counsel's cross-examination of a witness. The court eventually ordered respondent removed from the courtroom.

¶ 9        Later in the day, the trial court inquired of jail personnel whether respondent was available to confer with her counsel. Jail personnel informed the court that respondent did not want to be involved in the proceedings and was presently receiving mental health interventions per her request. Respondent's counsel moved multiple times to continue the proceedings so respondent could be present. The court denied those motions, reasoning it had continued the proceedings once and that appearing in court was a "stressor" for respondent.

¶ 10       The following is a summary of the evidence.

¶ 11       Respondent was 24 years old at the time of the hearing. She had two sons: A.H. and an older child, who lived with his father. Respondent was pregnant with another child.

¶ 12       Respondent's mother, Jennifer S., testified regarding respondent's mental health issues, which began when respondent was an adolescent. Jennifer explained that respondent was diagnosed with depression, anxiety, and bipolar disorder. According to Jennifer, respondent had a history of hospitalizations and refusing medication. Jennifer stated that respondent cycled through periods of doing well and not doing well, which Jennifer attributed to respondent's untreated mental illness. Jennifer testified that in 2022, both she and other people had requested law enforcement to check on respondent's safety. The trial court took judicial notice of records in two mental health court cases involving respondent, directing the State to provide the court with

certified copies of those records. However, those documents are not included in the record on appeal.

¶ 13    Jennifer testified that while respondent was pregnant with A.H., respondent threatened to commit suicide, saying she would sit on railroad tracks. A police officer testified that he conducted a welfare check on respondent on February 2, 2022, after respondent posted something on Snapchat involving a "disturbance" of a "violent nature." (This Snapchat post was not admitted into evidence.) Respondent did not open the door for the officer, but she told the officer through a window she was okay.

¶ 14    Shortly after A.H. was born, DCFS received a hotline report with concerns about respondent's mental health. Audrey Church, a DCFS child protection investigator, met with respondent on March 31 and April 1, 2022. Church testified she had concerns about respondent's mental health. Specifically, Church noticed respondent was "rapid-cycling" and "manic" in her emotions, appearing angry, tearful, and defensive, while sometimes laughing. According to Church, respondent reported that she was diagnosed with "bipolar, ADHD, and severe depression." Respondent told Church she refused medications because they were "poison" and a "conspiracy." Church consulted with her manager, and DCFS decided to implement a safety plan. Pursuant to that safety plan, Jennifer was to supervise respondent's interactions with A.H., and respondent would undergo a mental health assessment. Respondent also had to comply with the terms of a mental health program she was already participating in as part of a criminal case in Sangamon County.

¶ 15    DCFS terminated the safety plan on April 29, 2022. A.H. returned to respondent's care and custody, although respondent continued to receive services as part of her Sangamon County criminal case. Toward the end of the safety plan period, Jennifer noticed what she called

"cracks in the veneer" or "red flags" as to respondent's mental health. For example, Jennifer noticed respondent was agitated and was more interested in social media than in taking care of her crying baby. Once the safety plan was terminated, respondent stopped communicating regularly with Jennifer and was hostile when Jennifer called her.

¶ 16    Around May 18, 2022, Jennifer's family members alerted her to respondent's recent social media posts. Upon reviewing the posts, Jennifer became concerned about respondent's mental health and A.H.'s welfare. Concerns included that respondent was suicidal and was bringing A.H. around homeless strangers. Jennifer alerted Church to these concerns.

¶ 17    The State introduced into evidence as exhibits only some of respondent's social media posts that witnesses reviewed. For example, Church testified to seeing posts where A.H. was "dressed only in a diaper with strangers" and where respondent was "wandering around [a] shopping complex and placing [A.H.] with unknown individuals." Church's supervisor, Kasie Estes, testified to seeing similar posts. However, the State did not introduce as exhibits any social media posts depicting A.H. with strangers. (In one post the State introduced into evidence, respondent took a picture of a homeless person's belongings and commented that homeless people were sleeping near a restaurant. Neither respondent nor A.H. were visible in that picture.)

¶ 18    Some of the posts the State introduced into evidence contained material suggesting respondent was experiencing a mental health crisis. Specifically, in one post, respondent asserted, "[t]he plan was if they took [A.H.] I was going to go sit on railroad tracks [illegible] not move and not tell anyone when I was going to go do this." In another post, respondent wrote, "I told my mom the plan and what would happen if they took my son, again." In another post, respondent stated, "I told someone in the state—a provider my mom, the state would make me commit suicide for taking

my kids." In another post, respondent asserted, "TBH I can say so much but I just rather not take the meds that's all..not that it matters."

¶ 19    On May 19, 2022, police officers, DCFS personnel, and a mobile crisis unit from a local hospital contacted respondent at her home. Respondent interacted primarily with a member of the mobile crisis unit. DCFS took protective custody of A.H., and respondent was involuntarily committed for mental health treatment. A.H. then went to live with Jennifer.

¶ 20    When the hospital released respondent, Church met with her for a "transitional visit" on May 31, 2022. According to Church, respondent exhibited "more pronounced" mental health concerns than before. Specifically, respondent was argumentative and defiant. She directed racial slurs against DCFS personnel and "smacked" Church's car window. Within the next two hours, respondent purportedly sent Church 40 text messages that Church deemed aggressive, tangential, and irrational. Church testified that some of the messages alluded to respondent "sell[ing] her body to support herself." (When the prosecutor requested to admit these text messages into evidence as an exhibit, the court sustained an objection based on lack of foundation. The prosecutor then laid the foundation for the exhibit but never moved again to admit it into evidence. Consequently, these text messages are not in the record on appeal). Church's manager blocked respondent from texting Church. Church sought and obtained a civil no contact order against respondent.

¶ 21    Jennifer testified to her belief that respondent's mental health was "too unstable" for A.H. to be in respondent's care. Jennifer was A.H.'s foster parent. Jennifer denied contacting DCFS as a way to obtain custody of A.H, and she insisted she would rather respondent care for him. According to Jennifer, when respondent was "not in a manic state," she was "a very loving, very good mother."

¶ 22 The trial court found that the State proved both counts of the neglect petition by a preponderance of the evidence. The court noted that DCFS initially attempted to address its concerns without taking protective custody of A.H. Rather than being "some sort of acknowledgement that neglect wasn't occurring," the court viewed the initial safety plan as DCFS "trying to satisfy its goal of reunification and keeping children together." The court further found that respondent "has a mental illness" and that she "was not taking her medications." The court believed there were periods when respondent was "capable, or at least close to capable," of parenting with proper supervision. However, the court noted that this was "an up and down battle" for respondent and her family.

¶ 23 The trial court deemed Church's testimony credible. According to the court, Church's observation about respondent having a "rapid cycling of emotions" was "an identifier of the mental health issue that would lead to concern and possible and probable neglect in regards to" A.H. The court also determined that respondent's suicidal ideations created "a neglectful situation" for A.H. The court added: "Based upon Miss Church's testimony, and in regards to the testimony of [Jennifer], I do think that the Court has a fundamentally sound basis for finding that the minor is a neglected minor based on those mental illnesses."

¶ 24 Apparently referencing respondent's in-court conduct, the trial court also could not "completely discount what [it had] observed in this courtroom." Finally, the court noted that respondent's behavior after DCFS took protective custody of A.H. was "relevant and can be considered by the Court" as evidence of both respondent's mental health status and "what the potential and real risks [were] at the time that protective custody was taken."

¶ 25                                    B. The Dispositional Hearing

¶ 26    The trial court held a dispositional hearing in December 2022. The transcript of that hearing is not included in the record on appeal. However, the record contains a transcript of the court's dispositional ruling on January 25, 2023. Respondent appeared in court virtually on January 25 from jail. She directed angry outbursts at the court until the court muted her microphone. The court found there was a "clear need" for respondent to receive services. Because no father had been identified, there was no fit, willing, and able parent for A.H. The court found that it was in A.H.'s best interest to be placed in the custody and guardianship of DCFS. The court made A.H. a ward of the court.

¶ 27    Respondent timely appealed.

¶ 28                                    II. ANALYSIS

¶ 29    On appeal, respondent argues that the trial court's neglect finding was against the manifest weight of the evidence. According to respondent, there was no evidence that A.H. had been neglected, only evidence that third parties were concerned he *might be* neglected. Respondent does not challenge the dispositional order. In defending the judgment, the State emphasizes that an environment may be injurious to a minor even before the minor suffers harm.

¶ 30    The Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2022)) contains a two-step process for removing a minor from the custody of his or her parents and making the minor a ward of the court. *In re Z.L.*, 2021 IL 126931, ¶ 58. The first step is to hold an adjudicatory hearing to determine whether the minor is abused, neglected, or dependent. 705 ILCS 405/2-18(1) (West 2022); *Z.L.*, 2021 IL 126931, ¶ 59. If the court adjudicates the minor abused, neglected, or dependent, the second step is to hold a dispositional hearing to determine whether the minor should be made a ward of the court. 705 ILCS 405/2-21(2) (West 2022); *Z.L.*, 2021 IL 126931, ¶ 60. The State must prove its allegations by a preponderance of the evidence. *Z.L.*, 2021

IL 126931, ¶ 61. We will reverse a neglect finding only if it is against the manifest weight of the evidence, meaning that "the opposite conclusion is clearly evident." *Z.L.*, 2021 IL 126931, ¶ 61.

¶ 31 The State alleged A.H. was a neglected minor in accordance with section 2-3(1)(a) of the Act (705 ILCS 405/2-3(1)(a) (West 2022)) because he was "not receiving the proper care and supervision necessary for his wellbeing in that mother failed to make a proper care plan for the minor's supervision." The State also alleged A.H. was a neglected minor pursuant to section 2-3(1)(b) of the Act (705 ILCS 405/2-3(1)(b) (West 2022)) because his "environment is injurious to her [*sic*] welfare, as evidenced by mother's mental instability." The trial court adjudicated A.H. neglected on both bases, but we may affirm the judgment on either ground. See *In re Faith B.*, 216 Ill. 2d 1, 14 (2005) ("Only a single ground for neglect need be proven, and thus when the circuit court has found a minor neglected on several grounds, we may affirm if any of the circuit court's bases of neglect may be upheld."). We will focus on whether A.H.'s environment was injurious to his welfare.

¶ 32 The term "injurious environment" is "an amorphous concept that cannot be defined with particularity." *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004). Thus, neglect cases are "*sui generis*, and must be decided on the basis of their unique circumstances." *Arthur H.*, 212 Ill. 2d at 463. Generally, "injurious environment" encompasses situations where a parent fails to provide his or her children with a safe and nurturing shelter. *Arthur H.*, 212 Ill. 2d at 463. Where the State alleges neglect based on a parent's mental illness, the State must demonstrate that the illness places the child in an injurious environment. *Faith B.*, 216 Ill. 2d at 14. "Evidence that a parent exposed a child to a risk of danger is sufficient, even if the child has not yet been harmed by the danger." *In re K.F.*, 2023 IL App (1st) 220816, ¶ 50.

¶ 33    We hold that it was not against the manifest weight of the evidence for the trial court to adjudicate A.H. neglected based on an injurious environment. The uncontradicted evidence showed that respondent suffered from mental illness that went untreated for years because she refused medication. Jennifer detailed her efforts to obtain help for respondent, such as by asking police officers to conduct welfare checks and sharing concerns with DCFS personnel. The evidence showed that respondent's stability was cyclical and was at a low point after A.H. was born.

¶ 34    There was also evidence that respondent exhibited behaviors that endangered A.H. Jennifer testified that respondent expressed suicidal ideations while pregnant with A.H. Shortly before DCFS took protective custody of A.H., respondent again threatened suicide in her social media posts. Furthermore, based on other social media posts that were referenced at trial (but which inexplicably were not tendered by the State as exhibits), Jennifer and DCFS personnel were concerned that respondent was bringing A.H. around homeless strangers. On the day DCFS took protective custody of A.H., respondent was committed for involuntary treatment after interacting with a local hospital's mobile crisis unit.

¶ 35    The evidence showed that respondent's concerning behavior continued after the hospital released her. For example, respondent berated and harassed Church to the point she sought and obtained a civil no contact order. Respondent repeatedly disrupted the adjudicatory proceedings with rambling outbursts. Respondent's erratic behavior after DCFS took protective custody of A.H. underscored that respondent needed treatment before the trial court could confidently return A.H. to her care.

¶ 36    Finally, at the adjudicatory hearing, the trial court took judicial notice of respondent's court records from other cases. Those documents are not included in the record on

appeal. Respondent, as the appellant, bears the burden of presenting a "sufficiently complete record of the proceedings at trial to support a claim of error." *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391 (1984). We must presume that the information in these records provided additional support for the trial court's neglect finding. See *Foutch*, 99 Ill. 2d at 392 ("Any doubts which may arise from the incompleteness of the record will be resolved against the appellant.").

¶ 37                                    III. CONCLUSION

¶ 38          For the reasons stated, we affirm the trial court's judgment.

¶ 39          Affirmed.