2025 IL App (4th) 241427

NOS. 4-24-1427, 4-24-1430 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 21, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* BABY BOY and A.H., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
|       Petitioner-Appellee, | ) | Nos. 22JA121 |
|       v. | ) |     23JA122 |
| Lerin H., | ) | |
|       Respondent-Appellant). | ) | Honorable |
| | ) | Karen S. Tharp, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Justices Lannerd and Knecht concurred in the judgment and opinion.

**OPINION**

¶ 1        Respondent, Lerin H., appeals from the trial court's order terminating her parental rights as to her minor children, Baby Boy, also known as E.H. (born in 2023), and A.H. (born in 2022). On appeal, respondent contends (1) the court's unfitness finding was against the manifest weight of the evidence, (2) the court's best-interest finding was against the manifest weight of the evidence, (3) her due process rights were violated when the court denied her motion to represent herself, (4) the State failed to provide reasonable accommodations for respondent to complete required services during her incarceration, and (5) respondent was provided ineffective assistance of counsel. For the reasons articulated below, we affirm.

¶ 2        Additionally, unrelated to the merits of the termination of respondent's parental rights, this court issued a rule to show cause against respondent's attorney, William T. Panichi, as to why he should not be sanctioned for citing eight nonexistent cases in the briefs he filed on behalf of respondent. For the reasons articulated below, we find that Mr. Panichi violated Illinois Supreme Court Rule 375 (eff. Feb. 1, 1994) and order that (1) Mr. Panichi disgorge the payment of $6,925.62 he received for his work on this appeal; (2) Mr. Panichi pay $1,000 as monetary sanctions to the clerk of the Fourth District Appellate Court; and (3) the clerk of the Fourth District Appellate Court send a copy of this opinion to the Illinois Attorney Registration and Disciplinary Commission.

¶ 3                                I. BACKGROUND

¶ 4                                A. Underlying Action

¶ 5        Respondent gave birth to A.H. in March 2022. On May 23, 2022, the State filed a petition alleging that A.H. was a neglected minor because (1) he was "not receiving the proper care and supervision necessary for his wellbeing in that mother failed to make a proper care plan for the minor's supervision" (see 705 ILCS 405/2-3(1)(a) (West 2022)) and (2) his environment was injurious to his welfare, "as evidenced by mother's mental instability" (see 705 ILCS 405/2-3(1)(b) (West 2022)).

¶ 6        The trial court held an adjudicatory hearing on October 20 and November 17, 2022. The court then held a dispositional hearing in December 2022. On January 25, 2023, the court found that it was in A.H.'s best interest to be placed in the custody and guardianship of the Illinois Department of Children and Family Services (DCFS) and made A.H. a ward of the court. Respondent appealed to this court, arguing that the court's neglect finding was against the manifest weight of the evidence. This court affirmed. *In re A.H.*, 2023 IL App (4th) 230131-U, ¶ 33.

¶ 7　　　　We reiterate the salient facts here as relevant to this termination of parental rights appeal. In October 2022, respondent was arrested on federal charges of cyberstalking her previous caseworker. She was incarcerated at the time of the adjudicatory and dispositional hearings in connection with A.H.'s case. At the adjudicatory hearing on November 17, 2022, respondent requested to proceed *pro se*. Respondent began interrupting the trial court and her attorney, Selena Young, attempting to state that she was not a threat to herself or anyone else. The court tried to explain to respondent that she was not testifying at that time and that there was a process that the proceedings must follow. As respondent continued to interrupt, the court stated, "Based upon the communications I've just had with the respondent mother here in court, it seems to me that she is not comprehending what is going on in court nor the direction and structure of court adequately to represent her[self]." Thereafter, respondent continually interrupted the court and her own attorney until the court directed jail personnel to return respondent to the holding cell so the hearing could proceed.

¶ 8　　　　In May 2023, while respondent's first appeal was pending and she was incarcerated, she gave birth to E.H. On June 1, 2023, the State filed a petition alleging that E.H. was a neglected minor in that (1) E.H. "is not receiving the proper care and supervision necessary for his well-being in that Mother failed to make a proper care plan for the minor's supervision" (see 705 ILCS 405/2-3(1)(a) (West 2022)), (2) E.H.'s "environment is injurious to his welfare as evidenced by Mother's mental instability" (see 705 ILCS 405/2-3(1)(b) (West 2022)), and (3) E.H.'s "environment is injurious to his welfare as evidenced by the minor's sibling being adjudicated neglected and Mother's failure to make reasonable progress towards having the minor's sibling returned to her care" (see 705 ILCS 405/2-3(1)(b) (West 2022)). On August 3, 2023, the trial court held a shelter care hearing in connection with E.H.'s case and determined there was probable cause to believe

E.H. was neglected. The court granted DCFS temporary custody and guardianship of E.H. The court appointed Young to represent respondent over respondent's objection.

¶ 9        The trial court began the adjudicatory hearing in connection with E.H.'s case on August 24, 2023, and then continued it to a later date. At the hearing, respondent was represented by Sean Liles. The court entered an order on October 5, 2023, and determined that E.H. was neglected based on respondent's failure to make a proper care plan, "mental instability/health issues," and failure to make reasonable progress in the juvenile case as to A.H. The court noted, "mother had no plan for where child would go after birth, mother was in [federal] custody at the time, [previous] adjudication *re* mother's mental health, other child not returned to mother's care."

¶ 10       In November 2023, respondent was convicted of cyberstalking.

¶ 11       The trial court entered an order on November 1, 2023, finding that it was in E.H.'s best interest that he be made a ward of the court, respondent was unfit and unable to care for E.H., and reasonable efforts and appropriate services aimed at family preservation had been unsuccessful in rectifying the conditions leading to the finding of unfitness or inability. The order states: "mother in federal custody awaiting sentencing; mother must cooperate with recommended services including mental health treatment and parenting."

¶ 12       The trial court held two permanency hearings as to A.H. between May and August 2023 and four as to both A.H. and E.H. between December 2023 and August 2024. The court ordered custody and guardianship of the minors to remain with DCFS each time.

¶ 13       The State filed motions for termination of parental rights on May 7, 2024, as to A.H., and July 10, 2024, as to E.H. The petitions alleged that respondent (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare (750 ILCS 50/1(D)(b) (West 2024)), (2) failed to make reasonable efforts to correct the conditions that were

- 4 -

the basis for the removal of the minors from her custody within nine months following the adjudication of neglect (750 ILCS 50/1(D)(m)(i) (West 2024)), and (3) failed to make reasonable progress toward the return of the minors to her during any nine-month period following the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2024)). The nine-month periods alleged by the State as to A.H. were (1) November 17, 2022, to August 17, 2023, and (2) August 7, 2023, to May 7, 2024. The nine-month period as to E.H. was October 5, 2023, to July 5, 2024.

¶ 14                                                    1. *Fitness Hearing*

¶ 15        The trial court held the fitness hearing on October 17, 2024. At the beginning of the hearing, respondent's counsel, Liles, indicated that he sent a video writ to the federal prison in Waseca, Minnesota, and followed up to request that respondent attend the proceedings by video, but the prison ultimately told him it was only possible for respondent to appear telephonically, which she did. The evidence presented, as relevant to this appeal, is as follows.

¶ 16        Laura Kuehnel was a caseworker with Family Service Center (FSC) assigned to A.H.'s and E.H.'s cases as of October 2022. Kuehnel testified that A.H. came into care in May 2022 due to mental health concerns with respondent, and E.H. came into care when he was born in May 2023 because of those same concerns and because A.H. was already in care. At the time E.H. came into care, respondent was incarcerated in federal prison for cyberstalking her previous caseworker. At this point in the hearing, respondent began interrupting the testimony, and the trial court attempted to explain to respondent that her attorney was going to object and cross-examine the witness on her behalf. The court informed respondent that it would mute her if she continued interrupting. Returning to the testimony, Kuehnel stated that as of July 2022, respondent was required to engage in mental health services, substance abuse services, drug testing, and parenting classes. However, respondent had been terminated from Parent Place, Family Guidance Center,

and FSC due to her verbal aggression.

¶ 17        Kuehnel testified that respondent's visitation was suspended in September 2022 due to threats respondent made against her previous caseworker. As of September 2022, respondent had not signed any consent forms or releases of information, as required under her service plan. Respondent was arrested on federal charges in October 2022. While respondent was in custody in Sangamon County, Kuehnel facilitated two visits with A.H. in December 2022. Kuehnel facilitated two additional visits in February 2023, after respondent was transferred to the Macon County jail, but there was a plastic screen between respondent and A.H. at that facility, which made visitation difficult for both of them, and they both just cried. Respondent requested not to have visits at that point and chose to talk to A.H. only by phone. Kuehnel testified that contacting respondent while she was in jail was difficult but was made easier when Corporal Gatts was assigned to respondent's case as a point of contact in April 2023.

¶ 18        Kuehnel testified that Gatts was able to facilitate a child and family team meeting in May 2023. Kuehnel mailed the integrated assessment and service plan to respondent prior to the May 2023 meeting, but respondent mailed the documents back to her with additional writing, "stating that we were trying to take her children away, we were kidnapping her children, that she was not signing her rights away," and "a bunch of writings regarding the same things over and over pretty much." Kuehnel testified that she discussed the service plan with respondent during the May 2023 meeting. Respondent stated that "she was just there because she had to be there," then refused to speak, and once Kuehnel brought up signing the releases of information, respondent "became verbally aggressive and ended the call." On the State's motion, the trial court admitted respondent's integrated assessment and service plans into evidence.

¶ 19        Kuehnel testified that because respondent had not signed any releases, she could

not get any information about respondent's progress in completing her services. The only information Kuehnel obtained was that respondent was participating in Alcoholics Anonymous (AA), a women's group, and going to church; however, Kuehnel was told that respondent was not in mental health treatment because "she had been kicked out due to verbal aggression." In June 2023, E.H.'s foster parent attempted to talk with respondent and send her pictures, but respondent "cussed him out, and they ended the call." At some point, A.H.'s foster parent, who is respondent's mother, was taken off of the jail's call list because respondent was yelling and threatening her.

¶ 20       Kuehnel testified that respondent was convicted of the federal cyberstalking charges in November 2023 and transferred to a federal prison in Waseca in January 2024. At this point in the hearing, the trial court momentarily halted testimony due to some background noise from respondent's phone and asked her to mute herself while the noise was ongoing. Respondent informed the court the noise was her crying, saying, "I can't control it. I already know where this is going," and, "I really am trying to keep it together, but I'm so hurt that I cannot stop crying because I am so hurt, I'm so hurt."

¶ 21       When testimony resumed, Kuehnel stated that she was unable to have contact with respondent between October 2023 and January 2024 because respondent refused, and between January and March 2024 due to communication issues with the federal prison. Kuehnel stated that the "one and only thing [she] received" about respondent's mental health treatment was a note from a psychiatrist in March 2024, which merely stated "that they had concerns and just kind of that she was attending." Kuehnel explained that respondent had her contact information but never took the initiative to reach out to her.

¶ 22       Kuehnel was finally able to have another child and family team meeting with respondent in May 2024. At that meeting, they reviewed the service plan, visitation, and releases

of information. Kuehnel testified that respondent

"was cooperative with the entire thing and with setting up visits until we asked her about signing consents. Then she became very verbally aggressive and yelling and screaming and wanted to never see us or talk to us or have contact with us and didn't want to do visits. She wanted nothing to do with us."

¶ 23 Kuehnel testified that respondent reported that she was either doing parenting classes or trying to sign up for parenting classes, but Kuehnel was not able to verify that because respondent had not signed any releases of information. Kuehnel did not have any contact with respondent between May and August 2024, except receiving from respondent's prison caseworker "some certificates of her completing parenting phase 1 and some ACE classes" and participation in "some groups." Kuehnel did not know what an "ACE class" was and could not verify respondent's engagement. Kuehnel testified that even if respondent had engaged in those services and they were satisfactory, she would have needed to make more progress after being released to complete her service plan.

¶ 24 Kuehnel testified that respondent's last in-person visit with A.H. was in February 2023. Although respondent refused in-person visitation after that point, she had phone calls with A.H. until May 2024. Kuehnel testified that DCFS identified Thomas H., who was deceased, as the putative father for E.H. Thomas H.'s grandparents were tested for paternity in his stead and were found to be a 99.9% genetic match.

¶ 25 Before respondent's counsel started his cross-examination, the trial court allowed respondent and her counsel to enter a Zoom breakout room to confer to ensure that he could address all of her concerns during his cross-examination. Upon resuming cross-examination, Kuehnel testified that respondent said she would not sign any consent forms because she believed she was

signing her rights away and that it was a violation of federal health privacy laws, despite Kuehnel explaining several times that was not the case. Kuehnel explained that she had mailed the consent forms to respondent before the May 2023 child and family team meeting. She stated that there were several services available to respondent while incarcerated, including AA, a women's group, church, counseling, and psychiatric services, which the agency likely would have accepted. Respondent reported to Kuehnel that she was engaged in these services, but Kuehnel was unable to determine how much she engaged or the content of any of the classes. At some point, Kuehnel learned that respondent had been dismissed from telehealth psychiatric appointments due to verbal aggression. Kuehnel stated that she had not had any contact with respondent since May 2024.

¶ 26 Kuehnel further testified that she believed respondent was diagnosed with depression and "something like schizophrenia." Kuehnel stated that respondent believed she had been misdiagnosed and did not have mental health problems. The integrated assessment noted that respondent had a history of psychiatric concerns, including severe depression, attention-deficit/hyperactivity disorder (ADHD), and bipolar disorder. The assessment also reported that the interview had to be terminated after respondent "became agitated and her responses became more hostile." The May 2024 service plan likewise stated that respondent had a documented diagnosis of bipolar disorder but added that respondent's mother reported that respondent told her that she had been diagnosed with schizoaffective disorder. Kuehnel testified that respondent was not taking any medications. Kuehnel stated that respondent had never addressed her mental health concerns. Kuehnel explained that she was concerned about respondent's mental health because "she could go from being calm one minute to very aggressive in wording the next minute and screaming and yelling. She didn't really seem to have control over any emotions."

¶ 27    Respondent testified that she was advised by her mother, who was the foster parent of A.H., as well as her criminal attorneys from her federal case, not to communicate with Kuehnel. She did talk with Kuehnel on the phone in December 2023 and told Kuehnel that she would not complete the integrated assessment because of "[t]he clause that says I am asking the Court to permanently terminate my rights." She said she was "also concerned about the fact that I have been under psych malpractice," as she believed she had been misdiagnosed and did not want the trial court and DCFS to receive mental health documentation she believed to be incorrect. She accused the psychiatrist under whose care she had been between 2020 and 2022 of forcing medication and "not actually providing the care that I found to be a fiduciary relationship as he was very narcissistic, condescending, very unprofessional, refused to actually treat the patient and instead wanted to force a diagnosis on me." She said that she filed a malpractice suit against him. She claimed that she had never been removed from mental health services while at the Sangamon County or Macon County jails. She also filed malpractice suits against the providers she had while incarcerated in Sangamon and Macon Counties, as well as at the federal prison in Waseca.

¶ 28    Respondent testified that she signed up for services at the prison in Waseca as soon as she arrived there, but they had waiting lists for every class. She said that she was admitted to some of these classes in July 2024 only after she filed a grievance about the issue. She claimed to have completed phase two parenting classes and several ACE classes, which she said were intended to lower recidivism levels. She said she had been attending AA classes since she got to prison and had been sober from alcohol, marijuana, and nicotine for two years. She acknowledged she previously had an addiction to "air duster" that "led to an addiction of cocaine to get off the air duster."

¶ 29    Respondent testified that she did not object to engaging in any of the services

required by DCFS and believed she already completed all the services in her service plan. When her attorney asked if she would be willing to sign the releases of information after going over the clause with him, respondent expressed hesitation because of her "concerns with these providers" and would want the clause to be removed. She also claimed that she never refused visitation, but that "[t]he limited visitation has been all on DCFS's deciding that the relationship between me and my children and the physical contact and the bond is not, is not relevant," and "[t]he foster parents are unwilling to work with me half the time." She stated that her conditional release date was supposed to be March 31, 2025. She also maintained that "there's a chance that I have been wrongly incarcerated for the last two years of my life," and she was appealing her federal criminal conviction. She refused to discuss the events that led to her conviction.

¶ 30    When asked if she thought her caseworker's concerns about her mental health were accurate, respondent stated, "I am very frustrated because whenever I express concerns, there's a statute, a clause, there is like, you are wrong, you're delusional that is counteracting every emotion that I have." She expressed that she felt justified in her frustration, saying, "I believe that there is a vendetta that's against me" and "an agenda that you guys are trying to reach or somebody is that's trying to terminate my parental rights." She reported that she was working with a mental health provider. She stated that the only mental health issue she had was posttraumatic stress disorder (PTSD), which she was being treated for, but any other diagnoses were the result of psychiatric malpractice. When asked by the State whether she had a doctorate or medical degree, respondent said, "I plead the Fifth" (see U.S. Const., amend. V). She explained that she disputed the doctors' diagnoses "because I know what I suffer from" and "I read what they charted about me, and I mean, I clinically disagree." She continually repeated her belief that her providers violated their fiduciary relationships with her. She stated that she was not taking any medications.

¶ 31　　　　The trial court ultimately found that respondent was unfit because she failed to (1) show a reasonable degree of interest, concern, or responsibility to her children's welfare "by engaging in acts which lead [*sic*] to her being criminally convicted and sentenced" and (2) make reasonable progress during any nine-month period following the adjudication of neglect of either child. The court explicitly said it was not finding that respondent was unfit because she failed to make reasonable efforts. The court emphasized that "[i]t's very clear to the Court that there are mental health issues." The court noted that respondent had been psychiatrically hospitalized several times and that she filed malpractice suits against multiple psychiatrists who treated her both before and during her incarceration. The court pointed out that "it's very clear to the Court that you cannot make progress on mental health issues when you're suing your psychiatrist."

¶ 32　　　　The trial court reiterated several additional facts it believed to be relevant. Respondent was aggressive during the integrated assessment, which consequently had to be ended early. She refused to sign the integrated assessment. She had not consistently participated in mental health treatment or complied with treatment recommendations. The court also noted that it was not as concerned with whether respondent had completed parenting classes, maintained contact with her caseworker, or had visitation, as the primary issue was her mental health. The court pointed out that "[d]espite whether or not she's talking to someone, meeting with someone at any of these facilities, even if you could try and say there's some effort there, there is clearly no progress." The court also mentioned that respondent was incarcerated for cyberstalking and threatening a caseworker.

¶ 33　　　　　　　　　　　　　　2. *Best-Interest Hearing*

¶ 34　　　　The trial court held the best-interest hearing on October 31, 2024. The following evidence was presented. Kuehnel testified that she observed the minors once a month in their

respective homes. A.H. was placed with his maternal grandmother, who was in her forties, and E.H. was placed with his paternal aunt and uncle. At the time of the hearing, A.H. was two years old, and E.H. was one year old. A.H. lived with his grandmother, grandfather, uncle, and two dogs. E.H. lived with his aunt, uncle, some of his cousins, and a dog. Each of them had their own room. Both had strong bonds with their respective foster parents, who met all their needs. Every other week, A.H. and E.H. had an overnight visit together. Kuehnel testified that both boys were happy, always smiling, seemed very loved in their homes, went to their foster parents willingly for anything, and were very attached to the other family members in their homes. The foster parents of both children "have been very adamant" about maintaining their sibling relationship. Both foster parents were willing to adopt the children and signed permanency commitment forms. Kuehnel believed it was in the children's best interest to have respondent's parental rights terminated, as respondent "still needs significant mental health treatment."

¶ 35     On cross-examination, Kuehnel testified that she was previously able to observe A.H. with respondent, but A.H. "was very, very young and [respondent] cried most of the time and [A.H.] slept a lot of the time," so she could not say whether there was a bond between A.H. and respondent. Respondent had phone calls with A.H., and his foster parents "say that [respondent] talks to [A.H.] a lot," but he "doesn't respond much" because he is "still kind of young" and "otherwise he still runs and plays while she talks." Kuehnel noted that E.H.'s foster parents "made an attempt to talk with [respondent] and she had cussed [them] out." Kuehnel stated that the children live in different neighborhoods and would not be in the same school district. She testified that both foster parents "have stated that if [respondent] got the help she needs *** then they would be willing to involve her" in the children's lives after she was released from prison.

¶ 36     Respondent called Valerie Kessler Mathis as a witness. However, Kessler Mathis

never observed respondent with her children, so she was quickly dismissed from the witness stand.

¶ 37    Respondent testified next. She began her testimony by referencing statistics about children in DCFS's custody. Respondent expressed her concerns that A.H. and E.H. were separated and only reunited briefly, which "puts biological strain on the emotional well-being of the children on the antisocial behaviors." She believed that A.H. was "walking around with a picture of his mother crying that he wants her" and "showing behaviors that I'm concerned about." She also felt that there was hostility between her and E.H.'s foster parents. When asked whether Kuehnel's explanation for that hostility was accurate, respondent testified, "I did not cuss out the foster parents. I possibly used colorful words." She also expressed her belief that the foster parents and DCFS workers were committing a crime by interfering with her visitation rights. She believed that A.H. was "having a meltdown when [E.H.] leaves him" but acknowledged that she is "only allowed to observe over the phone." She expressed, "I myself, have been a victim of the state family courts for now 23 years." She further testified that if released from custody, she would go home; when asked where home is, she said, "[T]he home is the home address that I have," though she could not remember the address. She said that she would reside with Daniel K., her fiancé, with whom she had been in a relationship for three years.

¶ 38    Daniel K. testified next. He stated that he had been in a relationship with respondent for "[o]ver two years" but could not remember the actual date that they got engaged. He had observed respondent talking to A.H. over the phone but had never had any interaction with the children himself. He admitted to pleading guilty to misdemeanors in 2016 and 2024.

¶ 39    The trial court found that it was in the children's best interest that respondent's parental rights be terminated. The court noted the various factors it was required to consider under the statute. In its analysis, the court reiterated several salient facts. Both children had been living

- 14 -

in their respective homes for a significant time, given their ages. They were both placed with family members, though not together. They appeared to be smiling when Kuehnel saw them, and Kuehnel did not report that A.H. was upset when he was separated from E.H., as respondent stated. The court also acknowledged that "at two years old, everything is going to upset the two-year-old." Both children's foster parents stated they would adopt the children. Respondent was convicted and serving a sentence in federal prison, and she was "not here for her children," who deserved permanency. The court noted it was the first time that it heard that respondent was engaged and that Daniel K. had never even met either child. The court also emphasized that with respondent's "longstanding and severe" mental health issues, "it's going to take quite a bit of therapy and treatment and progress for her to address those issues to the point where she would be ready to have a child returned to her care even if at this point to have unsupervised visits." How long that would take was "a complete unknown at [that] point."

¶ 40        The trial court thus entered an order terminating respondent's parental rights. This appeal followed.

¶ 41                    B. Attorney's Conduct on Appeal

¶ 42        The circuit court of Sangamon County appointed Mr. Panichi on November 4, 2024, to represent respondent-appellant in this accelerated appeal from the termination of respondent's parental rights filed under Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). After an in-depth review of the briefs, this court recognized that Mr. Panichi cited eight apparently nonexistent cases in respondent's opening and reply briefs. In one instance, he provided a direct quote from one of these cases. Concerned that respondent's briefs contained citations to apparently nonexistent cases, this court, on its own motion, ordered Mr. Panichi to file copies of "*In re M.F.*, 2022 IL App (2d) 210614"; "*In re A.G.*, 2022 IL App (1st) 220119"; "*In re R.C.*, 195 Ill. App. 3d

827 (1st Dist. 1990)"; "*In re R.D.S.*, 2021 IL App (2d) 200092"; "*In re M.H.*, *Jr.*, 196 Ill. App. 3d 976 (1st Dist. 1990)"; "*In re Brandon E.*, 382 Ill. App. 3d 389 (2d Dist. 2008)"; "*In re K.L.P.*, 381 Ill. App. 3d 817 (4th Dist. 2008)"; and "*In re Ca. B.*, 386 Ill. App. 3d 507 (2d Dist. 2008)." We further ordered Mr. Panichi to appear before this court personally and show cause why he should not be sanctioned.

¶ 43 On June 16, 2025, Mr. Panichi filed a two-page response to this court's rule to show cause entitled "Verified Memorandum and Response to June 10, 2025, Order re Rule 375 Sanctions." He stated in paragraph 2(a) of his response that "the following two cases are valid, published Illinois Appellate Court decisions and were properly cited," and he cited "*In re Brandon A.*, 395 Ill. App. 3d 224 (4th Dist. 2009)," and "*In re Adoption of K.L.P.*, 316 Ill. App. 3d 110 (4th Dist. 2000)." In paragraph 2(b), he stated that "the following case is a valid published decision but was incorrectly cited in the brief," and he cited "*In re M.F.*, 304 Ill. App. 3d 236 (5th Dist. 1999)." In paragraph 2(c) of his response, he admitted that the "remaining five citations contained in the Appellant's Brief were determined to be invalid or nonexistent." He attached copies of the first three decisions referenced in his response.

¶ 44 Mr. Panichi appeared before this court personally on June 18, 2025. The proceedings were recorded. He acknowledged that he was familiar with the principles of Illinois Supreme Court Rule 341(h) (eff. Oct 1, 2020) and the principles of Illinois Rules of Professional Conduct of 2010 Rules 1.1, 3.1, 3.3 (eff. Jan. 1, 2010), and Rule 8.4 (eff. July 1, 2024). He stated that he had been appointed to handle this appeal by the circuit court of Sangamon County and was compensated for his work at the rate of $150 per hour, for a total of $6,925. He did not intend to submit any further invoices for this case. He later addressed this amount, explaining that it "was more than [he] usually charge[s]" and this case "was out of the ordinary in terms of time spent"

because his office "did some exceptional work trying to get some other information before the court" by filing "a brief trying to open up the proofs," but he did not remember the matter exactly.

¶ 45 Regarding his response in paragraph 2(a), the court pointed out to Mr. Panichi that despite his claim that *Brandon A.*, 395 Ill. App. 3d 224, and *Adoption of K.L.P.*, 316 Ill. App. 3d 110, were "valid" cases that "were properly cited," he had actually cited in his brief "*In re Brandon E.*, 382 Ill. App. 3d 389 (2d Dist. 2008)," and "*In re K.L.P.*, 381 Ill. App. 3d 817 (4th Dist. 2008)," which were completely different citations. (We also noted that *Adoption of K.L.P.* is a Second District case, not a Fourth District case, as Mr. Panichi wrote in his response.) The court further observed that neither *Brandon A.* nor *Adoption of K.L.P.* supports the propositions for which "*Brandon E.*" and "*K.L.P.*" were originally cited in his opening brief. Mr. Panichi stated that he was not currently familiar with the content of the cases but claimed that he had been so at one time. He admitted that he did not read either of these decisions before filing his response to the court's rule to show cause. He later admitted that he misread the court's rule to show cause as citing "*Brandon A.*," when it cited "*Brandon E.*" He acknowledged that he did not list a citation for "*Brandon E.*" in his response and never looked up whether "*Brandon E.*" existed.

¶ 46 Regarding his response in paragraph 2(b), the court noted during the hearing that *M.F.*, 304 Ill. App. 3d 236, the case Mr. Panichi claimed to have intended to cite, did not contain the quotation for which he cited "*In re M.F.*, 2022 IL App (2d) 210614," in his reply brief. Mr. Panichi admitted that he did not know where he obtained the quotation and did not believe it was accurate. The court stated that Mr. Panichi may have persisted in misleading the court in his statements in paragraphs 2(a) and 2(b) of his response.

¶ 47 Mr. Panichi later explained that his miscitation in his briefs of the three cases he attached to his response to the rule to show cause "might be an example of poor lawyering, poor

- 17 -

arguing, stretching principles, I don't have an answer for that." However, he then claimed that "to the best of [his] knowledge, [these cases] were cited for the appropriate principles." He admitted, though, that he had read only one of the three cases he attached to his response and could not remember which one. He further explained that he believed that the court's rule to show cause asked only for him to identify which cases existed, not to argue how those cases applied.

¶ 48 The court then turned to Mr. Panichi's response in paragraph 2(c) and asked how those five admittedly nonexistent citations came to appear in his brief. Mr. Panichi initially clarified that he did not claim to have an "excuse," just an "explanation." He also informed the court that he had already notified Judge Karen Tharp, who appointed him as counsel in this appeal, as well as his private clients whose appeals were pending, about these proceedings. He then admitted that in preparing the briefs and conducting research in this case, he used artificial intelligence (AI) to write a draft of the brief, then "looked it over and [he] did not read the cases that were in support of the brief." He further explained that at the time he filed the briefs in this case, he was "extremely busy" and "was not thorough enough." He stated that his use of AI was prompted by "a perfect storm" of "temptation of AI out there at a time when [he] was busy and trying to meet deadlines." He had since learned about AI "hallucinations," in which the AI "dreams things up when it doesn't have an answer." He acknowledged that he should have read the cases that the AI presented to him. He additionally admitted that he was "between research software" at the time he prepared the briefs in this case but had since signed up with Westlaw. He informed the court that he did not intend to use AI going forward.

¶ 49 Mr. Panichi admitted that "the whole thing stems from the fact that [he] barely did any personal work [him]self on this appeal." He stated that he "was careless" and "reckless when [he] did it" and "was wrong to do that." Mr. Panichi then stated:

- 18 -

"I don't have any reason that the court shouldn't sanction me, except for the fact that I didn't do it intentionally. I did it carelessly, and recklessly, I hadn't done it before, and if I'm lucky enough to be able to continue practicing before the appellate court, I'm not going to do it again."

He acknowledged that while he relied on the legal assistant in his office a great deal, he, as the attorney, was ultimately responsible in this matter. He stated, "[W]hatever happens, I deserve whatever consequences fall, and I'm willing to accept them." Mr. Panichi asked that no sanctions be imposed against respondent, as he was responsible, and further asked the court to consider allowing him to file an amended brief. He stated that if he were allowed to file an amended brief, he would essentially cite all new cases and read them.

¶ 50    This court informed Mr. Panichi that when it was discovered that the cases cited in his briefs apparently did not exist and did not support the assertions in his briefs, the court felt compelled to leave no stone unturned to determine whether these cases existed. The court noted the research done "was significant and time consuming." As an example, the court explained that when looking into the citation of "*In re M.F.*, 2022 IL App (2d) 210614," Westlaw and the Illinois Courts website confirmed that no case matching that citation existed. There were 20 Illinois cases titled "*In re M.F.*," but none of those cases contained the quotation included in Mr. Panichi's reply brief or any similar statement. Moreover, no Second District case existed under case No. 21-0614, though there was a Fourth District case with case No. 21-0614, *People v. Taylor*, 2022 IL App (4th) 210614-U, which was irrelevant. The quote included in Mr. Panichi's brief and attributed to "*In re M.F.*, 2022 IL App (2d) 210614," "incarceration does not preclude a finding of reasonable progress if efforts are made," did not exist in any case from Illinois, any other state, or any federal court, in its entirety. Even a part of the quote—"incarceration does not preclude"—did not exist in

any Illinois cases, but it did exist in 57 cases across the country, most of which were to the effect of "incarceration does not preclude termination of parental rights." This was the breadth of the work the court did in relation to just *one* of the eight nonexistent cases Mr. Panichi cited in his brief. The court noted that it was explaining this process to Mr. Panichi to illustrate how seriously the court took this matter, as well as the impact of Mr. Panichi's actions on the court's ability to do its other work efficiently.

¶ 51 When asked during the proceedings if he had any infirmities that would contribute to his carelessness in this case and his ability to practice law, Mr. Panichi stated that other than a hearing loss, he had "typical short term memory loss" and was overwhelmed by paperwork, but "to the best of [his] knowledge, [he] retain[s] 80, 90% of [his] faculties and memory on other matters" and believed he is competent to practice law.

¶ 52 On June 27, 2025, this court ordered Mr. Panichi to file an affidavit with a copy of any petition for fees and costs that he filed in the Sangamon County circuit court pursuant to Illinois Supreme Court Rule 299 (eff. Jan. 1, 2024), along with documentation of his receipt of payment. He did so on June 30, 2025. His affidavit and petition confirmed that he was compensated in the amount of $6,925.62 by the Sangamon County treasurer for his work in connection with his appointment in this appeal.

¶ 53                                    II. ANALYSIS

¶ 54                                 A. Underlying Action

¶ 55 On appeal, respondent's contentions are that (1) the trial court's unfitness finding was against the manifest weight of the evidence, (2) the court's best-interest finding was against the manifest weight of the evidence, (3) the court violated her right to self-representation, (4) the State failed to provide reasonable accommodations for her during her incarceration, and (5) she

was denied effective assistance of counsel.

¶ 56    Initially, we note that this is an accelerated appeal under Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). Under that rule, this court is required to issue its decision within 150 days after the filing of the notice of appeal unless there has been "good cause shown." Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). Here, respondent's notice of appeal was filed on November 4, 2024, and this court's disposition was due to be filed by April 3, 2025. That filing deadline has passed. However, this delay is due to respondent's counsel requesting and this court granting four extensions of time to file the opening brief. Even with four extensions, Mr. Panichi missed the final extended filing deadline, which was March 24, 2025, and subsequently filed a motion for leave to file the brief late on March 27, 2025. This court granted that motion, and he ultimately filed respondent's opening brief on March 31, 2025. Briefing was not complete until he filed the reply brief on May 1, 2025. In light of the delay resulting from the extensions of time, we find that good cause exists to issue our disposition after the 150-day deadline.

¶ 57    We also note that respondent's counsel's appellate brief is highly deficient. Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) establishes that an appellant's brief "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." The supreme court rules "are not mere suggestions." (Internal quotation marks omitted.) *In re Denzel W.*, 237 Ill. 2d 285, 294 (2010). "[T]hey have the force of law and are to be construed in the same manner as statutes." *Denzel W.*, 237 Ill. 2d at 294; see *Obert v. Saville*, 253 Ill. App. 3d 677, 682 (1993) ("A reviewing court is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented [citation], and it is not a repository into which an appellant may foist the burden of argument and research ***."). Respondent's brief does not comply with these requirements, as counsel, Mr. Panichi, does not

cite the record at all in the argument section, provides only one or two paragraphs of argument per issue, and cites one or two cases per issue only for boilerplate legal principles. Even more concerning, some of counsel's cited cases do not support the legal principle for which he is citing them, and eight of the cases that counsel cites *do not exist*, which is a very serious issue that this court will address separately below.

¶ 58　　　　This is not the level of advocacy we expect in accelerated cases dealing with a parent's fundamental rights. Nor is it the legal representation that respondent deserves. We considered striking the briefs and ordering the trial court to appoint new counsel for respondent to begin briefing anew. However, we have decided that doing so would not be the appropriate remedy for the rule violations under the specific facts presented. The resolution of this appeal has already been significantly delayed by numerous briefing extensions. After having reviewed the record thoroughly and researched the numerous issues that respondent's counsel raises, it is clear that there is no nonfrivolous issue that warrants further briefing on respondent's behalf. Given these circumstances, further delaying the resolution of this appeal plainly would not serve the best interest of the children. We will thus address the merits of each of respondent's issues despite the violations of supreme court rules in respondent's brief.

¶ 59　　　　　　　　　　　　　　　1. *Neglect Finding*

¶ 60　　　　Respondent contends in passing that "there was no direct evidence of abuse or neglect." To the extent she attempts to challenge the trial court's dispositional orders finding E.H. and A.H. neglected and adjudicating them wards of the court, we lack jurisdiction. In juvenile neglect cases, dispositional orders adjudging the minor to be a ward of the court are final, appealable judgments. *In re Leona W.*, 228 Ill. 2d 439, 456 (2008) (noting that a dispositional order removing a minor child from her parents' custody is "regarded as final and appealable as of right"

and appealing such an order "is the proper vehicle for challenging a finding of abuse or neglect"). Respondent already appealed the court's dispositional order as to A.H., which this court affirmed (see *A.H.*, 2023 IL App (4th) 230131-U, ¶ 33), and she did not file a notice of appeal from the dispositional order as to E.H. We thus lack appellate jurisdiction to review those orders. See *In re S.P.*, 2019 IL App (3d) 180476, ¶ 47; *Leona W.*, 228 Ill. 2d at 456-57.

¶ 61                                        2. *Unfitness*

¶ 62        The involuntary termination of parental rights involves a two-step process pursuant to section 2-29(2) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-29(2) (West 2024)). The State must first prove by clear and convincing evidence that the respondent is unfit. *In re C.M.*, 305 Ill. App. 3d 154, 163 (1999). The trial court found that respondent was unfit based on her failure to (1) maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare (750 ILCS 50/1(D)(b) (West 2024)) and (2) make reasonable progress toward the return of the minors within nine months following the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2024)).

¶ 63        We will not reverse a trial court's finding of unfitness unless it is against the manifest weight of the evidence. *In re Dar. H.*, 2023 IL App (4th) 230509, ¶ 54. A court's finding is against the manifest weight of the evidence "when the opposite conclusion is clearly apparent." *Dar. H.*, 2023 IL App (4th) 230509, ¶ 54. Under this standard, "we give deference to the trial court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and the witnesses and has a degree of familiarity with the evidence that a reviewing court cannot possibly obtain." *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002). We "must not substitute [our] judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn." *D.F.*, 201 Ill. 2d at 499. Ultimately, "[a] parent's

rights may be terminated if a single alleged ground for unfitness is supported by clear and convincing evidence." *In re D.C.*, 209 Ill. 2d 287, 296 (2004).

¶ 64 Respondent posits that the trial court erred in finding her unfit for failing to make reasonable efforts and progress, as the "trial court's findings failed to reflect the substantial efforts made by Respondent." However, the court did not find that respondent failed to make reasonable efforts; rather, it found that respondent (1) failed to maintain a reasonable degree of interest, concern, or responsibility and (2) failed to make reasonable progress. Respondent's arguments addressing her reasonable efforts are therefore irrelevant. As we may affirm the trial court's judgment "if the evidence supports the finding of unfitness on any one of the alleged statutory grounds" (*In re H.D.*, 343 Ill. App. 3d 483, 493 (2003)), we will focus our analysis only on whether respondent made reasonable progress.

¶ 65 Reasonable progress, which is assessed under an objective standard, exists when a parent's compliance with the service plan and the trial court's directives "is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991). A parent fails to make reasonable progress toward the return of the child when the parent fails " 'to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care.' " *In re C.N.*, 196 Ill. 2d 181, 217 (2001) (quoting 750 ILCS 50/1(D)(m) (West Supp. 1999)). Importantly, there is "a significant difference between going through the motions, checking off the boxes, and mechanically doing what is asked of the parent and actually changing the circumstances that brought the children into care." *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 56. A finding of unfitness is appropriate if "the court will not be able to return the child home in the near future, despite ample time and opportunity for compliance with the

court's directives." *Ta. T.*, 2021 IL App (4th) 200658, ¶ 55.

¶ 66 The trial court's unfitness finding in this case was not against the manifest weight of the evidence. A.H. came into care in May 2022, and E.H. came into care in June 2023 due to concerns about respondent's mental health impacting her ability to care for the minors. Respondent was taken into federal custody in October 2022. When the fitness hearing took place in October 2024, A.H. had been in care for over two years and E.H. for over one year, and respondent had been incarcerated for almost that entire time. The primary recurring issue in assessing respondent's progress was her refusal to sign releases of information, which prevented Kuehnel from verifying respondent's engagement in the services she claimed to have engaged in and completed. Moreover, the court was correct that respondent failed to make any progress on her mental health issues, which was the primary reason that the minors came into care.

¶ 67 Kuehnel testified that she learned that respondent had been removed from mental health treatment while incarcerated due to her verbal aggression. It was not the first time that respondent's instability resulted in her being removed from services, as by July 2022, she had already been removed from three service providers for the same reason. Kuehnel testified that respondent "didn't really seem to have control over any emotions" and "could go from being calm one minute to very aggressive in wording the next minute and screaming and yelling." This issue occurred repeatedly. The interview with respondent for the integrated assessment in July 2022 had to be cut short due to respondent's agitation and hostility. Child and family team meetings in May 2023 and May 2024 had to be terminated early when respondent became irate with her caseworkers for requesting that she sign releases of information. Respondent was verbally aggressive toward her children's foster parents, including her own mother, resulting in the foster parents limiting contact and being removed from the prison call list. Respondent's behavior in court was similarly

uncontrolled and aggressive at times, as she interrupted the trial court and the attorneys repeatedly with her own interjections.

¶ 68    The integrated assessment noted that respondent has documented diagnoses of severe depression, ADHD, and bipolar disorder. However, respondent staunchly denied having any mental health issues other than PTSD and maintained that any other diagnoses were psychiatric malpractice. She reported she was not taking any medications. She testified that she believed that people had a vendetta against her with the intent of terminating her parental rights and that she was justified in her frustration throughout the case and was herself a "victim of the state family courts for now 23 years." She stated that she had sued at least four psychiatrists for malpractice: one who provided care prior to her incarceration, one at the Macon County jail, one at the Sangamon County jail, and one at the federal prison in Waseca. She explained that one reason for her refusal to sign releases of information was her concern that DCFS would obtain access to her prior psychiatric records that reflected what she believed to be misdiagnoses.

¶ 69    All these facts reflect that throughout the pendency of these two cases, respondent never addressed her mental health issues, and the children plainly could not return to her care in the near future. The evidence showed that respondent had access to mental health treatment during the entire time she was incarcerated. However, the record also shows that respondent resisted treatment and refused medication. The trial court correctly pointed out that "it's very clear to the Court that you cannot make progress on mental health issues when you're suing your psychiatrist."

¶ 70    Respondent has thus failed "to substantially fulfill *** her obligations under the service plan and correct the conditions that brought the child into care." (Internal quotation marks omitted.) *C.N.*, 196 Ill. 2d at 217. She was no closer to the return of her children in October 2024 than she was when the children were removed from her custody in May 2022 and June 2023. As

"the court will not be able to return the child[ren] home in the near future, despite ample time and opportunity for compliance with the court's directives" (*Ta. T.*, 2021 IL App (4th) 200658, ¶ 55), the trial court's finding of unfitness was not against the manifest weight of the evidence.

¶ 71                              3. *Best-Interest Finding*

¶ 72          In her opening brief, respondent does not expressly challenge the best-interest finding; rather, she obliquely states that the "trial court's findings were against the manifest weight of the evidence." The words "best interest" do not appear in the opening brief at all. Respondent's counsel addressed the court's best-interest finding for the first time in the reply brief. The State is correct that this argument is forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief ***."). However, forfeiture of an issue "is a limitation on the parties and not on this court." *People v. Hanson*, 212 Ill. 2d 212, 216 (2004). Because we have elected not to dismiss the appeal or order rebriefing despite the pervasive violations of Rule 341(h), we will address the evidence supporting the court's best-interest finding despite forfeiture of the issue.

¶ 73          If a parent is found to be unfit, the State must then prove that terminating parental rights is in the minor's best interest. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 31. At this step, the focus shifts from the parent to the child. The burden on the State at the best-interest hearing is a preponderance of the evidence. See *In re D.T.*, 212 Ill. 2d 347, 366 (2004). When determining a minor's best interest, the trial court must consider the following factors,

> "in the context of the child's age and developmental needs:
>
> > (a) the physical safety and welfare of the child, including food, shelter, health, and clothing;
> >
> > (b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (West 2024).

¶ 74    The trial court's best-interest determination will not be disturbed on appeal unless it is against the manifest weight of the evidence. *J.B.*, 2019 IL App (4th) 190537, ¶ 33. We afford great deference to the court's determination, as it is in the best position to view the witnesses and judge their credibility. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71.

¶ 75 The trial court's best-interest finding in this case was not against the manifest weight of the evidence. Both A.H. and E.H. had been in foster care for almost their entire lives— A.H. was two months old when he was taken into care, and E.H. was taken into care immediately after his birth. While not placed together, both children were placed with family, with whom they were bonded and who provided for their safety and welfare. See 705 ILCS 405/1-3(4.05)(a), (d) (West 2024). After years in foster care, the court reasonably placed significant weight on the minors' need for permanence, which was not likely to be with respondent due to her incarceration and failure to address her mental health issues. See 705 ILCS 405/1-3(4.05)(g) (West 2024). The court correctly pointed out that with respondent's "longstanding and severe" mental health issues, "it's going to take quite a bit of therapy and treatment and progress for her to address those issues to the point where she would be ready to have a child returned to her care even if at this point to have unsupervised visits." The last time that respondent had seen A.H. in person was in February 2023. Respondent had not seen E.H. in person since his birth in May 2023. The minors' foster parents arranged biweekly overnight visits between the minors to ensure that they maintained their sibling bond. See 705 ILCS 405/1-3(4.05)(c), (g) (West 2024). Both foster parents had already signed permanency commitment paperwork.

¶ 76 Though respondent testified that the minors could live with her when she was released from prison, she could not remember the address of that home. She also stated that Daniel K., her fiancé, would live with them and help care for the minors. However, the trial court correctly pointed out that Daniel K. had never met or interacted with the minors and only observed some of respondent's phone calls with A.H. There is also no indication in the record that DCFS screened Daniel K. Thus, the children would have no attachment to or familiarity with Daniel K., while they did have demonstrable bonds with their foster families. Considering all these factors,

the court's finding that it was in the minors' best interest to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 77                                   4. *Self-Representation*

¶ 78            Respondent next argues that the trial court violated her right to self-representation where she "repeatedly and clearly expressed her desire to represent herself." After only three sentences of argument, with no citations to the record or any supporting cases, respondent makes the conclusory assertion that the denial of her right to self-representation constituted structural error and violated her constitutional rights. The State responds that this issue lacks merit because respondent never expressed dissatisfaction with Liles, who represented her during the termination proceedings, or asked to represent herself in the termination proceedings.

¶ 79            First, we find respondent's argument clearly violates Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) (stating the argument section "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on"). Moreover, our own review of the record confirms the State's contention that respondent never asked to represent herself in the termination proceedings that are the subject of this appeal. While respondent made a request to represent herself during the adjudication of wardship of A.H. and the temporary shelter care hearing as to E.H., those hearings are not the subject of this appeal. As the dispositional order is a final judgment in juvenile neglect cases (see *Leona W.*, 228 Ill. 2d at 456), respondent should have asserted that argument in her appeal from the dispositional order as to A.H. and again if she had appealed from the dispositional order as to E.H. As a result, we have no jurisdiction to review this argument in an appeal from the termination of her parental rights. See *Leona W.*, 228 Ill. 2d at 456-57.

¶ 80                           5. *Accommodations During Incarceration*

¶ 81 Respondent contends that the State and DCFS failed to provide reasonable efforts and accommodations during her incarceration. She relies on two cases, *D.T.* and *In re M.J.*, 314 Ill. App. 3d 649 (2000), to support the boilerplate statement that "the State must make reasonable efforts to reunify families, even when a parent is incarcerated." Respondent did not provide pinpoint citations of those cases. Thereafter, respondent's entire argument consists of three conclusory sentences:

> "DCFS failed to facilitate consistent visitation, ignored her parenting program completions, and failed to accommodate communication and video calls consistently. [Respondent's] incarceration was used as a basis to limit services and support. The State did not tailor its reunification efforts to her circumstances, denying her the tools needed to demonstrate progress."

Respondent also did not identify any remedy for this purported error.

¶ 82 Neither *D.T.* nor *M.J.* supports respondent's contention that the State must make reasonable efforts to reunify families even when a respondent is incarcerated; in fact, these cases do not discuss a respondent's incarceration or efforts by the State and DCFS at all. We also note that in her reply brief, respondent ostensibly relied on a case called "*In re M.F.*, 2022 IL App (2d) 210614," for the proposition that "incarceration does not preclude a finding of reasonable progress if efforts are made." However, no such case appears to exist, and we can find no case that contains that quote.

¶ 83 Respondent's argument also plainly fails on the merits. As compared to reasonable efforts, reasonable progress, as discussed above, is "an objective standard that is not concerned with a parent's individual efforts and abilities." *In re Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 21. It is true that "incarceration can impede progress toward the goal of reunification." *Nevaeh R.*,

2017 IL App (2d) 170229, ¶ 21. However, the Juvenile Court Act contains "no exception for time spent in prison," and "[i]ndeed, no mention is made of incarceration" in the statute. *In re J.L.*, 236 Ill. 2d 329, 340 (2010). Thus, "time spent incarcerated is included in the nine-month period during which reasonable progress must be made under section 1(D)(m)(ii)." *J.L.*, 236 Ill. 2d at 343.

¶ 84         Similar to *Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 24, "respondent's incarceration did not prevent [her] from complying with the service plan. [Her] failure to apply for the services is what resulted in [her] noncompliance." Kuehnel testified that respondent had many services available to her during her incarceration, which likely would have been sufficient to meet the requirements of her service plan, and she engaged in at least some of them. However, Kuehnel also testified that the main barrier to assessing respondent's progress was respondent's refusal to sign releases of information. That DCFS lacked critical information about respondent's progress was thus not the State's or DCFS's fault, but respondent's. Moreover, as discussed above, the primary reason that the trial court found respondent unfit was her failure to make reasonable progress in addressing her mental health issues, not her engagement in other services or lack of visitation. Mental health care was available to respondent during her incarceration; however, rather than using these services to address her mental health concerns, respondent denied that she had any issues and sued her psychiatric care providers for malpractice for misdiagnosing her with mental illnesses she "clinically disagreed" that she had. DCFS and the State did not deny respondent the accommodations she needed to progress toward completing her service plan while incarcerated—respondent denied herself the opportunity to make progress by failing to take responsibility for and address her significant mental health concerns.

¶ 85                         6. *Ineffective Assistance of Trial Counsel*

¶ 86         Respondent lastly argues that she was denied effective assistance of trial counsel

where counsel failed to call key witnesses, object to "inflammatory testimony," or advocate for meaningful accommodations during incarceration.

¶ 87 We "apply the same standard utilized in criminal cases to determine a parent's claim of ineffective assistance of counsel appointed under the Juvenile Court Act." *In re A.P.-M.*, 2018 IL App (4th) 180208, ¶ 39. Under that standard, the respondent must show that her counsel's performance was both deficient and prejudicial. *A.P.-M.*, 2018 IL App (4th) 180208, ¶ 39. An attorney's performance is deficient where it "fell below an objective standard of reasonableness." *A.P.-M.*, 2018 IL App (4th) 180208, ¶ 40. To establish prejudice, the respondent must show that "but for counsel's errors, there is a reasonable probability that the result of the proceeding would have been different." *A.P.-M.*, 2018 IL App (4th) 180208, ¶ 41.

¶ 88 Respondent has not shown that her trial counsel's performance was deficient or prejudicial. As the State correctly points out, respondent does not identify which witnesses her counsel failed to call, what testimony counsel failed to object to, or what accommodations counsel failed to request. Moreover, respondent was represented by two different attorneys during the proceedings below—Young and Liles—and she does not specify which attorney allegedly provided ineffective assistance. Our review of the record suggests respondent took issue with Young rather than Liles. However, Young did not represent respondent at the termination hearing and had not represented her since Liles appeared at the adjudicatory hearing as to E.H. in October 2023, a year prior to the termination hearing. Young's performance thus could not have changed the result of the termination proceedings.

¶ 89 To the extent that respondent instead intended to challenge Liles's representation, the record does not support her contention that Liles provided ineffective assistance. Liles vigorously represented respondent throughout the termination proceedings as to both children,

repeatedly contacted respondent's prison to try to secure respondent's appearance via videoconference rather than phone, frequently conferred with respondent, even in the middle of a hearing, to ensure he was addressing her concerns, objected to the admission of evidence and testimony during the hearings, called the witnesses that respondent wanted, and vehemently argued against the termination of her parental rights. His performance was neither deficient nor prejudicial.

¶ 90                                   B. Sanctions

¶ 91        The use of AI in the preparation of legal filings has not been previously addressed by the Illinois Appellate Court. The American Bar Association (ABA) has explained that generative AI (GAI) tools, such as ChatGPT, present a "risk of producing inaccurate output" because GAI is "prone to 'hallucinations,' providing ostensibly plausible responses that have no basis in fact or reality." ABA Comm. on Ethics & Pro. Resp., Formal Op. 512 (2024). The ABA explained that GAI tools "cannot replace the judgment and experience necessary for lawyers to competently advise clients about their legal matters or to craft the legal documents or arguments required to carry out representations." ABA Comm. on Ethics & Pro. Resp., Formal Op. 512 (2024). It also emphasized that "[i]n judicial proceedings, duties to the tribunal likewise require lawyers, before submitting materials to a court, to review these outputs, including analysis and citations to authority, and to correct errors, including misstatements of law and fact, a failure to include controlling legal authority, and misleading arguments." ABA Comm. on Ethics & Pro. Resp., Formal Op. 512 (2024).

¶ 92        Likewise, in its recent AI policy, the Illinois Supreme Court explained that while the use of AI is authorized while practicing in Illinois courts, users must understand its capabilities and thoroughly review any AI-generated content. Ill. Sup. Ct., *Illinois Supreme Court Policy on*

*Artificial Intelligence* (Jan. 1, 2025), https://ilcourtsaudio.blob.core.windows.net/antilles-resources/resources/e43964ab-8874-4b7a-be4e-63af019cb6f7/Illinois%20Supreme%20Court%20AI%20Policy.pdf [https://perma.cc/WCE6-WZE5] (hereinafter AI Policy). The court emphasized that "[u]nsubstantiated or deliberately misleading AI-generated content that perpetuates bias, prejudices litigants, or obscures truth-finding and decision-making will not be tolerated." AI Policy, *supra*.

¶ 93        Though the Illinois Appellate Court has not yet dealt with the issue of litigants submitting fictitious AI-generated case law, courts from other jurisdictions have. The federal district court for the Southern District of New York emphasized:

> "Many harms flow from the submission of fake opinions. The opposing party wastes time and money in exposing the deception. The Court's time is taken from other important endeavors. The client may be deprived of arguments based on authentic judicial precedents. There is potential harm to the reputation of judges and courts whose names are falsely invoked as authors of the bogus opinions and to the reputation of a party attributed with fictional conduct. It promotes cynicism about the legal profession and the American judicial system. And a future litigant may be tempted to defy a judicial ruling by disingenuously claiming doubt about its authenticity." *Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443, 448-49 (S.D.N.Y. 2023).

¶ 94                               1. *Mr. Panichi's Conduct*

¶ 95                          a. Paragraph 2(a) and (b) of Mr. Panichi's Response

¶ 96        In his response to this court's rule to show cause ordering him to file copies of the eight apparently nonexistent cases, Mr. Panichi claimed in paragraph 2(a) that two of these cases

did exist and "were properly cited" in the brief and claimed in paragraph 2(b) that a third case existed but "was incorrectly cited." He attached copies of these three cases to his response.

¶ 97        A review of the three purportedly valid cases reveals that Mr. Panichi's claims are false. He claims that he correctly cited the existing cases of *Brandon A.*, 395 Ill. App. 3d 224, and *Adoption of K.L.P.*, 316 Ill. App. 3d 110. In his briefs, however, he cited "*In re Brandon E.*, 382 Ill. App. 3d 389 (2d Dist. 2008)," and "*In re K.L.P*, 381 Ill. App. 3d. 817 (4th Dist. 2008)." As this court pointed out at the hearing on June 18, 2025, these are clearly different cases with different names and different citations. Thus, despite his claim to the contrary, these cases were not "properly cited" in his briefs. As to the third case, he claimed to have incorrectly cited "*In re M.F.*, 2022 IL App (2d) 210614," when the correct citation was to *M.F.*, 304 Ill. App. 3d 236.

¶ 98        However, *none* of these three existing cases support the propositions for which Mr. Panichi purportedly cited them in his briefs. In his opening brief, Mr. Panichi cited "*In re Brandon E.*, 382 Ill. App. 3d 389 (2d Dist. 2008)," to support the statements that (1) "This Court also reviews *de novo* any constitutional issues raised, such as denial of the right to self-representation or ineffective assistance of counsel" and (2) "Due process includes the right to self-representation in civil proceedings where fundamental liberty interests are at stake." The decision in *Brandon A.*, 395 Ill. App. 3d 224, which he claimed to have cited correctly all along, does not discuss constitutional issues or self-representation.

¶ 99        Mr. Panichi then cited in his opening brief "*In re K.L.P*, 381 Ill. App. 3d. 817 (4th Dist. 2008)," for the statement that "Ineffective assistance of counsel applies in parental rights cases and is evaluated under the *Strickland v. Washington* standard: deficient performance and resulting prejudice." In his response to the rule to show cause, he claimed to have properly cited the decision "*In re Adoption of K.L.P.*, 316 Ill. App. 3d 110 (4th Dist. 2000)," which is actually a

Second District case; however, that case does not discuss ineffective assistance of counsel.

¶ 100 Lastly, in his reply brief, Mr. Panichi purported to quote "*In re M.F.*, 2022 IL App (2d) 210614, ¶ 38," as stating "incarceration does not preclude a finding of reasonable progress if efforts are made." In his response to the rule to show cause, he claimed this was an incorrect citation of *M.F.*, 304 Ill. App. 3d 236. However, the language that Mr. Panichi quoted appears nowhere in that decision. The case does not discuss a respondent's incarceration at all. He admitted at the hearing that he did not know where he obtained the quotation and did not believe it was accurate. As the court detailed in the hearing on June 18, 2025, not only is the originally cited 2022 case nonexistent, but no such quote exists in any case, either in whole or in part, that would support the same proposition. Moreover, the quote itself seems nonsensical, as it confuses the separate principles of "reasonable progress" and "reasonable efforts" applicable in termination of parental rights cases.

¶ 101 When asked why he cited these cases in his response, Mr. Panichi first claimed it was due to "poor lawyering, poor arguing, stretching principles," but later claimed that "to the best of [his] knowledge, [these cases] were cited for the appropriate principles." However, during the hearing, Mr. Panichi admitted that he did not read at least two of the three cases that he attached to his response. He explained that he believed that he was asked only to identify which cases existed, not to argue how those cases applied.

¶ 102 This court finds Mr. Panichi's response inadequate and not credible. That Mr. Panichi did not read these decisions before attaching them in his response to this court's rule to show cause is clear. It is also clear to this court that Mr. Panichi neither "properly cited" two cases nor "incorrectly cited" the third; rather, his claims of doing so, as the court pointed out at the hearing on June 18, demonstrate his persistence in misleading this court. He admitted that he

mistook the court's order as referencing "*Brandon A.*," rather than "*Brandon E.*," meaning that he did not look back at the briefs he filed in this court to check whether he correctly cited this case or even meant to cite this case in the first instance. Though he could not explain how he arrived at providing these cases, it is obvious that Mr. Panichi simply looked up the case name and provided any existing Illinois case that happened to have the same or a similar name. Moreover, he could not have intended to cite any of these three cases in the first place, as he admitted that he used AI to generate a draft of the brief and did not check the citations in the AI-generated response. Despite his claims to the contrary, the three cases that Mr. Panichi originally cited in his briefs appear to be three examples of AI "hallucinations." That he did not admit the nonexistence of the cases originally cited in his brief is a serious matter.

¶ 103                              b. Paragraph 2(c) of Mr. Panichi's Response

¶ 104          In paragraph 2(c) of his response, Mr. Panichi admitted that the remaining five cases identified by this court do not exist. As discussed above, he admitted that he used AI to generate a draft of the brief, along with the supporting citations, and that he did not independently verify any of these citations himself. He now believed these five cases were AI "hallucinations."

¶ 105          Not only do these specific cases not exist, but in some instances, there are no existing cases that support Mr. Panichi's arguments on appeal at all. As an example, Mr. Panichi cited "*In re R.D.S.*, 2021 IL App (2d) 200092, ¶ 49," in support of his assertion that the trial court erred by failing to conduct an inquiry under *Faretta v. California*, 422 U.S. 806 (1975), when respondent asserted her right to represent herself in the proceedings. Mr. Panichi admitted this Second District case does not exist. Even worse, however, is that there are no Illinois cases requiring the application of *Faretta* to parental rights cases. Thus, not only did the AI "hallucinate" the case name, it also apparently "hallucinated" this point of law. Other citations are similarly

unfounded and misleading.

¶ 106                                    2. *Rule Violations*

¶ 107          Under Illinois Supreme Court Rule 375 (eff. Feb. 1, 1994), this court may, on its own initiative, impose appropriate sanctions upon a party or attorney if this court determines that they "have wilfully failed to comply with the appeal rules" or if "the appeal or other action itself is frivolous." For the following reasons, we determine that sanctions against Mr. Panichi under Rule 375 are appropriate based on his conduct in connection with his representation of respondent on appeal.

¶ 108                                    a. Rule 375(a)

¶ 109          There are myriad rules that apply to appeals, including the Illinois Supreme Court rules and Illinois Rules of Professional Conduct of 2010. Mr. Panichi has violated many of them.

¶ 110          By citing cases that do not exist for principles of law that do not exist, Mr. Panichi violated Illinois Supreme Court Rule 341(h)(7) (eff. Oct 1, 2020), which requires that an appellant's brief contains "citation of the authorities *** relied on."

¶ 111          We are also concerned about Mr. Panichi's disregard of several Illinois Rules of Professional Conduct of 2010. By using AI to generate a draft of the briefs and not verifying the generated output, Mr. Panichi made the same mistake as the attorneys in *Mata*, who admitted to " 'operating under the false assumption' " that AI would not " 'produce completely fabricated cases.' " *Mata*, 678 F. Supp. 3d at 451. Illinois Rule of Professional Conduct of 2010 Rule 1.1 (eff. Jan. 1, 2010) requires lawyers to "provide competent representation to a client." Competent representation "requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." Ill. R. Prof'l Conduct (2010) R. 1.1 (eff. Jan. 1, 2010). Part and parcel of maintaining such competence is "keep[ing] abreast of changes in the law and its practice,

- 39 -

including the benefits and risks associated with relevant technology." Ill. R. Prof'l Conduct (2010) R. 1.1, Committee Comments (eff. July 6, 2023); see ABA Comm. on Ethics & Pro. Resp., Formal Op. 512 (2024) ("To competently use a GAI tool in a client representation," "lawyers must have a reasonable understanding of the capabilities and limitations of the specific GAI technology that the lawyer might use."). By failing to educate himself prior to using AI about the risks inherent in the technology, such as "hallucinations" of false information, Mr. Panichi failed to maintain his competence to represent his client.

¶ 112    Mr. Panichi's conduct also implicates professional conduct rules 3.1, 3.3, and 8.4(c) by using nonexistent cases in his briefs and thus making false statements and misrepresentations of the applicable law to this court. See Ill. R. Prof'l Conduct (2010) R. 3.1 (eff. Jan. 1, 2010) ("A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good-faith argument for an extension, modification or reversal of existing law."); R. 3.3(a)(1) (eff. Jan. 1, 2010) ("A lawyer shall not knowingly *** make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer[.]"); R. 8.4(c) (eff. July 1, 2024) ("It is professional misconduct for a lawyer to" "engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.").

¶ 113    Moreover, by obtaining these nonexistent case citations and accompanying quotations using AI without independently verifying their accuracy, Mr. Panichi failed to comply with the Illinois Supreme Court Policy on Artificial Intelligence, which emphasizes that attorneys "are accountable for their final work product" and "must thoroughly review AI-generated content before submitting it in any court proceeding to ensure accuracy and compliance with legal and ethical obligations." AI Policy, *supra*.

¶ 114     Although it is indisputable that Mr. Panichi violated numerous rules governing the conduct of attorneys representing clients in appeals, such violations must be willful to be sanctionable under Rule 375(a). Black's Law Dictionary defines "willful" as "voluntary and intentional, but not necessarily malicious" and clarifies that "[a] voluntary act becomes willful, in law, only when it involves conscious wrong or evil purpose on the part of the actor, or at least inexcusable carelessness, whether the act is right or wrong." Black's Law Dictionary (12th ed. 2024).

¶ 115     Mr. Panichi may not have intentionally chosen to submit fictitious cases to this court, but he intentionally generated briefs using AI tools and intentionally did not check any of the citations that were generated by AI before filing the briefs. At a minimum, this conduct constitutes inexcusable carelessness. Mr. Panichi acknowledged at the hearing that he was familiar with the principles of Rule 341(h) and the principles of Illinois Rules of Professional Conduct of 2010 Rules 1.1, 3.1, 3.3, and 8.4. He admitted that he (1) was "reckless," "careless," and "negligent"; (2) did not read any of the cases cited in the AI-generated briefs and did not do any independent research; (3) did not read the cases that he attached to his response to this court's rule to show cause; and (4) "barely did any personal work [him]self on this appeal." He also continued to mislead the court by maintaining that he properly cited two existing cases in his brief, even though the cases he identified in his response did not match the citations or even the case names of the cases cited in his briefs. See *Mata*, 678 F. Supp. 3d at 457 ("These misleading statements support the Court's finding of subjective bad faith."); *United States v. Hayes*, 763 F. Supp. 3d 1054, 1064 (E.D. Cal. 2025) (finding the attorney's "inaccurate and misleading statements were not inadvertent as claimed, but knowing and made in bad faith"). Mr. Panichi even maintained during the hearing that "to the best of [his] knowledge, [these cases] were cited for the appropriate

principles," despite the court explicitly and thoroughly explaining that they were not. While we certainly believe that Mr. Panichi's conduct was not intentionally malicious and appreciate his candor, he chose to ignore his professional obligations. Mr. Panichi has thus willfully failed to comply with appeal rules under Rule 375(a).

¶ 116                                    b. Rule 375(b)

¶ 117          Mr. Panichi has also violated Rule 375(b), as his arguments on appeal were frivolous. An appeal is deemed frivolous where it is "not warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law." Ill. S. Ct. R. 375(b) (eff. Feb. 1, 1994). "In determining whether an appeal is frivolous, we apply an objective standard; the appeal is considered frivolous if it would not have been brought in good faith by a reasonable, prudent attorney." (Internal quotation marks omitted.) *In re Marriage of Lindell*, 2023 IL App (2d) 220055, ¶ 25.

¶ 118          Mr. Panichi cited fictitious cases for propositions that were not supported by existing law. "A fake opinion is not 'existing law' and citation to a fake opinion does not provide a non-frivolous ground for extending, modifying, or reversing existing law, or for establishing new law." *Mata*, 678 F. Supp. 3d at 461.

¶ 119          Aspects of this appeal are frivolous because they would not have been brought in good faith by a reasonable, prudent attorney. A reasonable attorney would have thoroughly reviewed the briefs he submitted to this court to ensure that his arguments were meritorious and that his citations were accurate. Mr. Panichi failed to do so. Instead, Mr. Panichi misled the court about the applicable law, in effect perpetrating a fraud upon the court. See *Mata*, 678 F. Supp. 3d at 461 ("An attempt to persuade a court or oppose an adversary by relying on fake opinions is an abuse of the adversary system."). Consequently, Mr. Panichi's conduct violated Rule 375(b).

¶ 120                          c. Appropriate Attorney Sanctions

¶ 121        Sanctions for violations of Rule 375(a) may include "an order to pay a fine, where appropriate, *** against any party or attorney for a party or parties." Ill. S. Ct. R. 375(a) (eff. Feb. 1, 1994). In turn, sanctions for violations of Rule 375(b) "may include an order to pay to the other party or parties damages, the reasonable costs of the appeal or other action, and any other expenses necessarily incurred by the filing of the appeal or other action, including reasonable attorney fees." Ill. S. Ct. R. 375(b) (eff. Feb. 1, 1994). The committee comments to Rule 375 add that, "Under paragraph (b), a penal fine may be imposed if the conduct in a particular case also constitutes a violation of the civil appeals rules as set forth in paragraph (a) above." Ill. S. Ct. R. 375, Committee Comments (adopted Aug. 1, 1989). See *Sterling Homes, Ltd. v. Rasberry*, 325 Ill. App. 3d 703, 709 (2001) ("The purpose of Rule 375(b) is to condemn and punish the abusive conduct of litigants and their attorneys who appear before us.").

¶ 122        The Illinois Appellate Court apparently has not yet addressed in a published opinion the imposition of sanctions under Rule 375 against an attorney who submitted fictitious cases generated by AI to the court. However, the court has imposed a variety of sanctions on attorneys for other misconduct under Rule 375. See *Board of Managers of Northbrook Country Condominium Ass'n v. Spiezer*, 2018 IL App (1st) 170868, ¶ 27 (imposing a $750 fine and requiring the attorney to attend six hours of civility and professionalism courses for making disparaging statements against the court and opposing party); *Mote v. Estate of McManus*, 2025 IL App (4th) 241307, ¶ 85 (ordering the appellant and his counsel to pay the appellee $5,250 for attorney fees and costs for bringing a frivolous appeal aimed only to delay, harass, or cause needless expense to the appellant); *Parkway Bank & Trust Co. v. Korzen*, 2013 IL App (1st) 130380, ¶¶ 9-10, 84, 86, 92, 101-02 (sanctioning the appellant $5,000 and increasing the money

judgment in favor of the appellee by $23,432.05, the attorney fees for the case below, rather than dismissing the appeal, for filing a frivolous appeal and filing a brief with numerous violations of Rule 341).

¶ 123　　　　Additionally, though not under Rule 375, at least one Illinois circuit court has sanctioned an attorney under Illinois Supreme Court Rule 137 (eff. Jan. 1, 2018) for citing a nonexistent case. See *D'Angelo v. Vaught*, No. 21-CH-29 (Cir. Ct. Williamson County, Apr. 2, 2025) (imposing sanctions of $2,000 against an attorney "for citing a non-existent case to the Court on two separate occasions").

¶ 124　　　　Furthermore, federal and state courts across the country have imposed sanctions on attorneys who submitted fictitious cases. See *Mata*, 678 F. Supp. 3d at 466 (imposing a $5,000 penalty against attorneys who cited fictitious cases generated by ChatGPT); *Wadsworth v. Walmart Inc.*, 348 F.R.D. 489 (D. Wyo. 2025) (sanctioning an attorney who cited fictitious cases generated by AI by revoking his *pro hac vice* status and imposing a $3,000 fine); *Garner v. Kadince, Inc.*, No. 20250188-CA, 2025 WL 1481740 (Utah Ct. App. May 22, 2025) (sanctioning an attorney who cited fictitious cases by ordering him to pay the opposing party's attorney fees, refund his client all fees charged and paid, and pay $1,000 in the form of a donation to a nonprofit); *Lacey v. State Farm General Insurance Co.*, No. CV 24-5205, 2025 WL 1363069 (C.D. Cal. May 5, 2025) (sanctioning attorneys who cited fictitious cases by striking their briefs, paying $26,100 to the defense as reimbursement for the costs of the Special Master, and paying $5,000 to the defense for legal fees incurred); *Hayes*, 763 F. Supp. 3d at 1073 (imposing a $1,500 fine where the attorney submitted a motion quoting language from a nonexistent case and initially attempted to claim that he had mistakenly cited that case in place of another, which also did not contain that

quote); *Shahid v. Esaam*, No. A25A0196, 2025 WL 1792657 (Ga. Ct. App. June 30, 2025) (imposing a $2,500 fine where the attorney cited nonexistent cases but did not admit to using AI).

¶ 125    Turning to the case at bar, this court appreciates and takes into consideration Mr. Panichi's candor that he used AI to generate the briefs, as well as his acceptance of responsibility for his conduct and any consequences. We also note that Mr. Panichi told this court that he has not previously been disciplined or sanctioned by any court or other disciplinary body. However, not only did Mr. Panichi cite fictitious cases in submissions to this court, he was also not entirely honest with this court, as discussed above, when he maintained that two existing cases had been properly cited and one had been incorrectly cited.

¶ 126    As we discussed above, though this court considered striking Mr. Panichi's briefs in this appeal under Rule 375(a) because of his citation to fictitious cases, we chose not to do so and addressed the merits above. Mr. Panichi's request to file an amended brief "citing only verified case law" is therefore denied.

¶ 127    This court, instead, chooses to impose monetary sanctions against Mr. Panichi under Rule 375(a) and (b). Mr. Panichi is responsible for his conduct in preparing these legal filings, and we have no reason to believe respondent was aware of or played any role in his conduct. Mr. Panichi submitted to this court a copy of the petition for attorney fees that he filed in the Sangamon County circuit court, along with further documentation confirming that he had been paid $6,925.62 by the Sangamon County treasurer. He was paid at a rate of $150 per hour under Illinois Supreme Court Rule 299 (eff. Jan. 1, 2024). At the hearing on June 18, he claimed that this amount "was more than [he] usually charge[s]" and this case "was out of the ordinary in terms of time spent" because his office "did some exceptional work trying to get some other information before the court" by filing "a brief trying to open up the proofs." However, he simultaneously

- 45 -

admitted to using AI to generate the briefs, not doing any of his own independent research, and even that he "barely did any personal work [him]self on this appeal." These statements contradict not only each other, but the itemization of time he attached to his petition for attorney fees.

¶ 128 Mr. Panichi's petition for attorney fees reflects that he billed (1) four hours for "Legal research *re:* fitness findings and reasonable efforts," (2) five hours for "Draft[ing] Argument sections and compil[ing] authority," (3) two and a half hours for "finaliz[ing] and fil[ing] Appellant's Opening Brief," (4) four and a half hours for "Draft[ing] Appellant Reply Brief," and (5) another four hours for "Draft[ing] and fil[ing] Appellant Reply Brief." There is no reference in the petition to "a brief trying to open up the proofs" or any motion, proceeding, or brief other than the opening and reply briefs. Given that Mr. Panichi admitted that he relied entirely on AI to draft the brief and conduct research, did not do any research, drafting, or citation verification himself, and "barely did any personal work [him]self on this appeal," these billing statements are not credible. He thus billed Sangamon County for up to 20 hours of legal research and drafting that appear questionable.

¶ 129 We therefore rule that Mr. Panichi must disgorge the payment of $6,925.62 that he received from the Sangamon County treasurer under Illinois Supreme Court Rule 299 (eff. Jan. 1, 2024) for being appointed to represent respondent in this appeal. He must issue payment of this amount to the Sangamon County treasurer within 30 days of this order and submit within 5 days after payment a receipt to this court reflecting said payment.

¶ 130 We also choose to impose an additional fine under Rule 375(a) and (b). See Ill. S. Ct. R. 375(a)-(b) (eff. Feb. 1, 1994); Ill. S. Ct. R. 375, Committee Comments (adopted Aug. 1, 1989). Mr. Panichi misled this court, as discussed above, by citing eight fictitious cases and maintaining that three of them existed when confronted about it. Moreover, this appears to be the

first issued opinion in the Illinois Appellate Court addressing the citation of fictitious cases generated by AI, and an additional penalty will help deter other attorneys from following in Mr. Panichi's footsteps. We impose an additional $1,000 penalty for Mr. Panichi's violation of Rule 375(a) and (b).

¶ 131     To be clear, nothing in this opinion is intended to categorically forbid attorneys from using AI tools—in fact, the Illinois Supreme Court AI policy explicitly permits the use of AI. However, attorneys must use AI tools *wisely*. We reiterate the supreme court's reminder that "[a]ll users must thoroughly review AI-generated content before submitting it in any court proceeding to ensure accuracy and compliance with legal and ethical obligations." AI Policy, *supra*. Flagrant and unprincipled use of AI without ensuring the accuracy of the generated response "is an abuse of the adversary system" (*Mata*, 678 F. Supp. 3d at 461), as it wastes court resources that would be better spent elsewhere.

¶ 132     We are cognizant of our responsibility under the Code of Judicial Conduct to "inform the Illinois Attorney Registration and Disciplinary Commission" if "a lawyer has committed a violation of the Illinois Rules of Professional Conduct of 2010 that raises a substantial question regarding the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects." Ill. Code Jud. Conduct (2023), Canon 2, R. 2.15(B) (eff. Jan. 1, 2023). Accordingly, a copy of this opinion shall be sent to the Illinois Attorney Registration and Disciplinary Commission by the clerk of the Fourth District Appellate Court.

¶ 133                                    III. CONCLUSION

¶ 134     For the reasons stated, we affirm the trial court's judgment. We also order the following sanctions against attorney William Panichi:

(1) Mr. Panichi must disgorge the payment of $6,925.62 he received for his

work on this appeal to the Sangamon County treasurer within 30 days of the filing of this opinion and must submit, within 5 days after payment, a receipt to this court reflecting said payment;

(2) Mr. Panichi shall pay $1,000 as monetary sanctions to the clerk of the Fourth District Appellate Court within 30 days of the filing of this opinion; and

(3) The clerk of the Fourth District Appellate Court shall send a copy of this opinion to the Illinois Attorney Registration and Disciplinary Commission.

¶ 135   Affirmed.

*In re Baby Boy*, 2025 IL App (4th) 241427

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Sangamon County, Nos. 22-JA-121, 23-JA-122; the Hon. Karen S. Tharp, Judge, presiding. |
| **Attorneys for Appellant:** | William T. Panichi, of Springfield, for appellant. |
| **Attorneys for Appellee:** | John C. Milhiser, State's Attorney, of Springfield (Patrick Delfino, Thomas D. Arado, and Laura Bialon, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |