NOTICE
Decision filed 11/21/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 250520-U

NO. 5-25-0520

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* ETHAN C., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macon County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| v. | ) | No. 21-JA-209 |
| | ) | |
| Eduardo C., | ) | Honorable |
| | ) | Erick F. Hubbard, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE CATES delivered the judgment of the court.
Justices Sholar and Hackett concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The circuit court's findings that the respondent father was an unfit parent and that termination of his parental rights was in the best interests of the child were not against the manifest weight of the evidence.

¶ 2   The respondent, Eduardo C. (Father), appeals the Macon County circuit court's order of June 9, 2025, finding him unfit as a parent and June 30, 2025, order finding it in the best interest of Father's biological minor child, Ethan C., to terminate Father's parental rights. Father argues on appeal that the circuit court's orders finding him unfit and terminating his parental rights were against the manifest weight of the evidence. For the following reasons, we affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4      On December 3, 2021, the State filed a petition for adjudication of wardship due to allegations of neglect and abuse, pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (705 ILCS 405/2-3(1)(b) (West 2020)). The petition alleged that environmental issues in the home were injurious to Ethan C., who was 3 weeks old at the time of filing, due to his premature birth at 31 weeks[1] gestation and subsequent health issues. Ethan had breathing issues, a hernia, and possible vision issues; he was hospitalized from birth through December 1, 2021. The petition also alleged that Ethan was abused because his parents created a substantial risk of physical injury to him. The petition indicated that Ethan's mother, Dawn C. (Mother), previously had her parental rights terminated for another child, and she could not independently parent a child, and Father worked daily and was unable to assist Mother in parenting Ethan.

¶ 5      On the same day, the circuit court held a shelter care hearing and entered an order granting the Department of Children and Family Services (DCFS) temporary custody of Ethan. On January 24, 2022, the circuit court entered an adjudicatory order finding Ethan to be neglected because Mother "has prior termination of parental rights," Ethan is "medically complex" and would be medically and environmentally neglected, "Mother cannot independently parent," and Father is unable to assist with parenting duties due to work. The parties stipulated to the allegations. The circuit court entered a dispositional order the same day, making Ethan a ward of the court and appointing the Guardianship Administrator of DCFS as Ethan's guardian. Father and Mother were granted supervised visitation.

_____

[1]The petition alleged Ethan was born at 31 weeks gestation and was 3 weeks old at the time the petition was filed. Later testimony indicates that Ethan may have been born earlier at 28 or 29 weeks gestation and he was approximately 6 weeks old at the time the petition was filed.

¶ 6    Lutheran Child and Family Services (LCFS), on behalf of DCFS, filed its first permanency report on June 14, 2022. LCFS continued to file review reports of Father's progress and detailed visitation, home inspections, and Ethan's progress in his foster home. On April 16, 2025, the State filed an amended motion seeking a finding of unfitness and permanent termination of parental rights of both Father and Mother. The motion alleged that Father and Mother failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare. 750 ILCS 50/1(D)(b) (West 2024). Further, the State alleged they had deserted the minor for more than three months prior to the unfitness proceeding. 750 ILCS 50/1(D)(c) (West 2024). The motion stated that Father and Mother failed to make reasonable efforts to correct the conditions that were the basis for the removal of the minor from the parent during any nine-month period following the adjudication of neglect. 750 ILCS 50/1(D)(m)(i) (West 2024). The motion also stated that Mother and Father failed to make reasonable progress toward the return of Ethan during any nine-month period for the following time periods: March 21, 2022, to December 21, 2022; December 21, 2022, to September 21, 2023; September 21, 2023, to June 21, 2024; and June 21, 2024, to March 25, 2025. 750 ILCS 50/1(D)(m)(ii) (West 2024).

¶ 7    The matter proceeded to a fitness hearing on June 9, 2025. Before the hearing began, Mother signed a final and irrevocable surrender for purposes of adoption. The matter then continued to the fitness hearing for Father. The State called Lillian Briscoe, a child welfare specialist with LCFS. Briscoe was assigned to Ethan's case in September 2023. She testified that Ethan was born prematurely at 28 or 29 weeks, and as a result, Ethan was diagnosed with asthma, developmental delay, seizure disorder, Noonan's syndrome, and a number of heart defects at birth. Due to his health issues, his living environment is important because of the number of allergies he has; he requires breathing treatments.

3

¶ 8    Briscoe testified that the initial case for Ethan was opened because his parents disclosed that their home was not fit for Ethan to live in upon his impending release from the hospital. In addition to the environmental concerns, Mother previously had her rights terminated for another child. Briscoe stated that when the case opened, Father was recommended to "complete cooperation, visitation, maintain a safe and sanitary home, a mental health evaluation, and parenting classes." Father completed both his mental health evaluation and parenting classes. Briscoe said that Father cooperated with LCFS, and the agency did not have any issues with him.

¶ 9    Father had to maintain a safe and sanitary home as well. Eight home safety checks were completed over the course of the three-and-a-half-year case. The safety checks reported the following: (1) smoke detectors did not work, exposed wires, and outlet not properly attached; (2) the outlets still not attached, choking hazards on the lower level of the coffee table, improper care of animals, and litter boxes in reach and unkept; (3) litter boxes in reach and unkept; (4) strong odors in the home, animal urine, and cockroaches; (5) bugs in the home and incorrect storage of cleaning products; (6) the sixth safety check passed; (7) cockroaches in the home, and animals unvaccinated and not taken care of; and (8) cockroaches in the home and animals unvaccinated. Briscoe testified that Father did remove some animals from the home and vaccinated the remaining cat. The urine smell improved, but still remained. Father cancelled the other scheduled home safety checks due to items in the home not working.

¶ 10    For visitation, Father started with once a week for four hours. Visitation was later reduced to once a week for two hours due to the poor progress of the safe and sanitary home and Ethan's age. Visitation was cancelled several times by the agency and the parents, or the parents ended visitation early. When the agency cancelled, it offered makeup times, but the parents declined the extra visitation time. Sometimes Mother and Father would attend separately, but they usually

4

attended together. Briscoe was unsure which parent would cancel the visits each time. The reports showed that Father cancelled visits 11 times and ended early 7 times. Visitation improved when the time was reduced to two hours in October 2023. Briscoe testified that visitation occurred in the LCFS offices for the duration of the case, minus a two-week period when the home safety check passed. Visitation did not increase from two hours due to the failure to maintain a safe and sanitary home.

¶ 11    Briscoe testified that for the past two years, Ethan has not returned home due to his medical condition, Mother's health issues, and the cleanliness of the home. Mother had physical limitations due to her health issues and was unable to clean the home. Father worked full-time and additionally had to take care of Mother and the home. If Ethan returned home, Father told Briscoe that he would find childcare and transportation for Ethan and his numerous medical appointments. Father's niece would be an alternate babysitter. However, Ethan could not return home due to the house being in unsafe conditions for him, and LCFS never rated Father as satisfactory on the safe and sanitary housing portion of his family service plans. LCFS additionally rated Father unsatisfactory on his visitation portion from December 2022 to September 2023, and September 2023 to June 2024.

¶ 12    On cross-examination from Father's attorney, Briscoe stated that Father was employed and had been for the length of the case. The last safety check was in July 2024. No further checks were completed because Father disclosed that the water heater and/or the furnace were not working, so the checks were cancelled. For the previous home safety checks, Father would repair some of the issues, such as the outlets and eliminated the bugs. Briscoe testified that Father was engaged during visitation, but previously had issues at the beginning because he would focus on his phone, fall asleep, or would need a reminder as to Ethan's care, such as the need to use a sippy cup instead of a bottle. LCFS cancelled visitation 12 times, and visitation only occurred 6 times at the home

5

before being returned to the agency due to concerns about the home's safety. Briscoe stated that Father had been cooperative with the agency.

¶ 13    On cross-examination from the guardian *ad litem* (GAL) for Ethan, Briscoe testified that after visits held in Father's home, Ethan had adverse health reactions to the environment in the home and had to go to urgent care to receive breathing treatments. This was due to the environment affecting his asthma. The State presented no further evidence or witnesses.

¶ 14    Father then testified on his own behalf. Father stated that he works as a heating changer at DraCool-USA on day shift and has throughout the duration of the case. Father does not have a driver's license, so he rides with coworkers or neighbors to work. Father stated that he completed all parenting and mental health requirements from LCFS. He tried to correct everything wrong with the house, including vaccinating the cat and removing other animals from the home. While the furnace was broken in October 2024, Father had it repaired, but stated that Briscoe did not come back to the house after it was fixed. Father stated that he never cancelled visits, but Mother did. Father did not know the visit was being cancelled until the last minute, and he did not know anything about the rescheduling. He would leave work to attend visitation.

¶ 15    If Ethan returned home, Father arranged childcare and transportation for him. Additionally, the home looked good now, the remaining cat is vaccinated, the litter box is cleaned every two days, the odor has improved, and there are no bugs. No one has completed a home safety check since July 2024. Father denied focusing on his phone during visits, but did fall asleep during one visit due to being tired from work. Father brings food for Ethan and plays with him during visits. When LCFS would bring Ethan for visits at the house, they would not bring his medical equipment for his breathing issues, and Father never observed Ethan have any reactions to the home or animals inside the home. Father stated that he was aware of Ethan's breathing issues and is

6

prepared to take care of him, even if that includes removing the cat from the home. Father only recalled ending one visit early, and that was because Ethan had a fever and Father told LCFS to take him to the hospital.

¶ 16    On cross-examination from the State, Father stated that Mother was the one who cancelled visits, and he never scheduled separate visits because they were still married at the time. Father also denied LCFS offering any makeup dates for cancelled visitation. For the first home safety check, Father stated that he had the outlet repaired two days after the visit, and it was corrected before the second check. Father testified that the water heater and furnace were broken, but he corrected both and informed Briscoe about the repair.

¶ 17    On cross-examination from the GAL, Father testified that he has two friends who would help him get Ethan to and from medical appointments, as well as daycare. For the cancelled visits, Father stated that Mother cancelled the visits, then he would find out about it when he got home. He testified that the caseworker never, at any point throughout the length of the case, reached out to him individually or provided her contact information to him. As to the cleanliness of the house, Father stated that the house is now clean, and it was only dirty because of Mother. Mother and Father have started divorce proceedings. Since she left the house, it is now clean. Father presented no further evidence or witnesses, and the matter proceeded to arguments.

¶ 18    The State argued that Ethan came into care because of environmental issues, Mother's health, and Mother's previous termination of parental rights. Ethan has been in care for three and a half years, and the focus of LCFS during this time has been the home environment. At the time of filing the petition in March 2025, the home was never in a condition where Ethan could be present for, at best, a couple of weeks before the home reverted to unsuitable conditions. Due to Ethan's health issues, the safety of the home was the barrier to his returning home, and after two

7

years, LCFS felt as though the home was still not safe for him. The State argued that because of this, Father failed to maintain a reasonable degree of interest, concern, or responsibility as to Ethan's welfare, and he has failed to make progress toward the return of Ethan. Different issues with the home kept arising and did not remain the same, but were still a barrier for Ethan.

¶ 19 Father's counsel argued that he has done everything except fully address the issues with the house. When issues arose with the house, Father tried to get them under control, but new issues would occur. Counsel stated, "I think one of the main problems, Judge, is that there's been no inspection of that house since July of last year, almost a year ago." Father repaired the furnace and informed the caseworker of the repair, but no additional inspection was completed. The other issues were all corrected. As far as visitation, there were some questions as to the cancellations and rescheduling, but the visits have been going well. Father has been bringing the items Ethan needs to visits, even though LCFS did not bring his medical equipment. Father has made arrangements to and from daycare and medical appointments. Counsel argued that the State has not proved "anything" by clear and convincing evidence.

¶ 20 The GAL said that they are in agreement with the State. Additionally, the GAL stated:

> "I find it very difficult to believe that in three and a half years the father in this case has never availed himself to being contacted by the caseworker especially when that's directly in conflict with other testimony about when visits were being set up and when they were trying to be arranged for furnaces to be fixed."

¶ 21 The circuit court found that there was clear and convincing evidence as to the condition of the home being unacceptable for an extended period of time. Of the eight home checks, only one passed and more issues later occurred to have visits removed from the home again. As to visitation, the court stated:

8

"I do have some credibility concerns as to [Father] insofar as him having the opportunity to reach out to the caseworker. I find it somewhat lacking in credibility to expect to believe that throughout the life of the case that was filed in 2021 that [Father] has not had the contact information for the caseworker to be able to try to coordinate or understand what has happened with visitation."

Due to visits being cancelled, not rescheduled, ending early, or disinterest in the visit from Father, the court found that there was clear and convincing evidence that Father failed to make reasonable progress during the following nine-month periods: December 21, 2022, to September 21, 2023; September 21, 2023, to June 21, 2024; and June 21, 2024, to March 25, 2025. Further, there was clear and convincing evidence that throughout the life of the case, the home has been unacceptable, especially for a child with health issues. Ethan had to receive health treatments after several visits due to respiratory distress due to the conditions of the home. The court found that Father was unfit.

¶ 22    On June 30, 2025, a best interest hearing was held. The State proceeded to call Briscoe as a witness. She again testified that she is the caseworker for Ethan's case and has been since October 2023. Briscoe stated that she sees Ethan two or three times a month, either at home or at the office. Due to his health issues, Ethan sees 12 different medical specialists, in addition to receiving different therapies. His foster mom takes him to his medical appointments and is supportive of any new treatments or doctors that may be needed for Ethan's care. Briscoe said that Ethan is always running to his foster mom, they are always playing together, and have a "special bond." Briscoe testified, "[Ethan] very clearly has an attachment to her and shows a lot of affection and love to her." Ethan refers to his foster mother as "mom," lives with her two 16-year-old daughters at home, and refers to her long-term partner as "dad." Ethan has been in her placement since the day he came into care in 2021.

¶ 23    Ethan attends an early intervention head start program and will go to preschool, depending on his needs. Ethan has a lot of friends and is very social, and his foster mom ensures that Ethan has appropriate interactions with children his own age. Briscoe never observed anything concerning in the foster home. She stated that Ethan is clean, well-fed, and well-taken care of, and he is bonded with his entire foster family.

¶ 24    On cross-examination from Father's counsel, Briscoe testified that Ethan attends medical appointments once or twice a month, and some of his health issues have improved as he has gotten older. Ethan still suffers from breathing issues and falls ill with respiratory illnesses easily. The foster mother is employed, but was still able to make medical appointments. Briscoe also stated that she spoke with the foster mother, who expressed a willingness to communicate with Father, as long as there was no resentment or conflict. The State presented no further evidence.

¶ 25    Father then testified on his own behalf. He stated that Briscoe had not been to the house since last year, and the house is now ready to have Ethan in the home. Father stated that Mother's 19-year-old niece would be willing and able to take Ethan to medical appointments when Father is at work and unable to attend, and be at the home with Ethan when he gets home from school. Father testified that he did not think it would be in the best interest of Ethan to terminate Father's parental rights. During a brief cross-examination from the GAL, Father testified that he has never been given the opportunity to attend medical appointments with Ethan.

¶ 26    The State then argued that it is in Ethan's best interest that Father's rights be terminated. Ethan has been with his foster mom for the entirety of his life, aside from the six weeks he was in the hospital. The State said that Ethan has formed attachments and bonds with his foster mom, he developed a sense of identity and self with her and his familial relationships. Ethan's foster mom

10

takes excellent care of him, including his complex medical issues and ensuring he has proper care. Based on the best interest of Ethan, the State argued that Father's rights be terminated.

¶ 27    Father's counsel argued that "Even though it's a lower burden of proof here I think, Judge, there is in [Father's] favor here to not terminate his rights today." Father has repaired his home for Ethan's return, but the caseworker has not been to the home in quite some time. Father was never afforded the opportunity to attend medical appointments to understand his issues. Father has found someone to take care of Ethan while Father is at work, including medical appointments. Further, visits between Father and Ethan have gone well. Father argued that it would not be in the best interest of Ethan to terminate Father's rights.

¶ 28    The GAL argued that, in agreement with the State, that it would be in Ethan's best interest to terminate Father's parental rights and for Ethan to remain with his foster mom. With regard to medical appointments, the GAL argued that there may be a lack of credibility considering that Father previously stated that the caseworker had never reached out to Father during the length of the case, despite several interactions between them. The GAL stated that the petition to terminate Father's rights should be granted.

¶ 29    The circuit court stated that it had to consider statutory factors as to Ethan's best interest. These best interest factors include the physical safety and welfare of the child, including food, shelter, health, and clothing. The court said that the testimony showed that Ethan is very well cared for and he has developed well in his placement. For the child's sense of attachment, the court stated that Ethan has developed a sense of identity and formed bonds within his foster home, which leads to a sense of attachment. For the child's sense of security, familiarity, and continuity of affection, the testimony of Briscoe and the best interest report on file showed this element was "soundly established." Ethan has been with his foster placement since December 2021, and he has a need

11

for permanence, including his relationships with his foster family. The court found that, by a preponderance of the evidence, the State has met its burden and terminated Father's parental rights. Father timely appealed.

¶ 30                                    II. ANALYSIS

¶ 31    On appeal, Father argues that the circuit court's findings were against the manifest weight of the evidence with respect to both his unfitness and the child's best interest. We disagree.

¶ 32                               A. Standard of Review

¶ 33    Termination of parental rights involves a two-step process. First, the State must prove that the respondent parent is unfit by clear and convincing evidence. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 62. This heightened standard is required because the termination of parental rights results in "a permanent and complete severance of the parent-child relationship" (*In re C.N.*, 196 Ill. 2d 181, 208 (2001)), thereby curtailing a fundamental liberty interest (see *In re C.N.*, 196 Ill. 2d at 216). If the circuit court finds a parent unfit, the proceedings move to the second step, at which the State must prove by a preponderance of the evidence that termination is in the child's best interests. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 73.

¶ 34    We give great deference to the circuit court's finding of unfitness because that court had the opportunity to observe and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). As such, we will not reverse the circuit court's finding of unfitness unless it is against the manifest weight of the evidence. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 63. A finding of unfitness is against the manifest weight of the evidence only if the opposite conclusion is clearly evident from our review of the record. *In re Daphnie E.*, 368 Ill. App. 3d at 1064. We apply the same standard in reviewing the circuit court's best interest determination. *In re*

12

*Baby Boy*, 2025 IL App (4th) 241427, ¶ 74. With these principles in mind, we turn our attention to Father's arguments.

¶ 35                                    B. Unfitness

¶ 36    A parent may be found unfit if the State proves any one of the statutory grounds for unfitness by clear and convincing evidence. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 63; see also 750 ILCS 50/1(D) (West 2024) (providing that, "The grounds of unfitness are *any one or more* of the following" (emphasis added)). As such, we may affirm the circuit court's decision if the evidence supports its finding of unfitness on any one of the grounds alleged. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 64.

¶ 37    In this case, the State alleged two grounds for unfitness: failure to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare (750 ILCS 50/1(D)(b) (West 2024)) and failure to make reasonable progress toward the return of the minor during any nine-month period following the adjudication of neglect or abuse (750 ILCS 50/1(D)(m)(ii) (West 2024)). The nine-month periods at issue for reasonable progress are March 21, 2022, to December 21, 2022; December 21, 2022, to September 21, 2023; September 21, 2023, to June 21, 2024; and June 21, 2024, to March 25, 2025.

¶ 38    With respect to the first ground of unfitness, section 1(D)(b) of the Adoption Act provides that a parent may be found unfit for "[f]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." 750 ILCS 50/1(D)(b) (West 2024). Since the language of the statute is in the disjunctive, any one of the three individual elements, *i.e.*, interest *or* concern *or* responsibility, may be considered by itself as a basis for unfitness. *In re B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31; 750 ILCS 50/1(D)(b) (West 2024). In determining whether a parent has shown a reasonable degree of interest, concern, or responsibility for a minor's welfare, a court

13

considers the parent's efforts to visit and maintain contact with the child as well as other indicia, such as inquiries into the child's welfare. *In re Daphnie E.*, 368 Ill. App. 3d at 1064. Completion of service plans may also be considered evidence of a parent's interest, concern, or responsibility. *In re Daphnie E.*, 368 Ill. App. 3d at 1065. The court must focus on the parent's efforts, not his or her success. *In re Adoption of Syck*, 138 Ill. 2d 255, 279 (1990). In this regard, the court examines the parent's conduct concerning the child in the context of the circumstances in which that conduct occurred. *In re Adoption of Syck*, 138 Ill. 2d at 278. Accordingly, circumstances such as difficulty in obtaining transportation, poverty, actions and statements of others that hinder visitation, and the need to resolve other life issues are relevant. *In re Adoption of Syck*, 138 Ill. 2d at 278-79. We are mindful, however, that a parent is not fit merely because he or she has demonstrated some interest or affection toward the child. *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004). Rather, the interest, concern, or responsibility must be objectively reasonable. *In re Daphnie E.*, 368 Ill. App. 3d at 1064.

¶ 39     Father argues on appeal that he was cooperative with the agency and that the visits were cancelled by Mother. He testified at the unfitness hearing that for the duration of the case, he never had the contact information for the caseworker, so he was unable to reschedule visits. When visitation decreased to two hours per week, Father argues that his attendance improved, and his interactions with Ethan additionally improved with time.

¶ 40     A review of the evidence shows that Father did complete two of the recommended services in the plan: parenting classes and a mental health assessment. The service plan also included two other items: visitation and maintaining a safe and sanitary home. Visitation was reduced to two hours per week as a result of unsatisfactory progress for the safe and sanitary home goal and Ethan's age. During the visits, Father was reported to be focused on his phone or falling asleep.

14

While some visits were cancelled by LCFS, rescheduling was offered, but never accepted by Father. During the fitness hearing, Father stated this was because he never, for the length of the case, had the contact information of the caseworker. The circuit court directly found this testimony to be lacking in credibility.

¶ 41 In addition to visitation, Father had to maintain a safe and sanitary home for Ethan as part of the service plan. Out of the eight home safety checks, the home only passed one check. Within the same month, during a follow-up visit, the home was no longer considered safe due to bugs. Some issues were corrected, but overall, the home was not a safe and sanitary place for Ethan, especially in light of his health issues. Briscoe testified that Ethan required medical attention after home visits and received breathing treatments. Despite Father's awareness of the importance of providing a safe home for Ethan, the home continued to fail safety checks for the length of the case. Father even cancelled the last two checks due to the water heater and furnace being broken, then he never rescheduled. Due to his inability to provide a safe and sanitary home for Ethan, Father did not comply with this portion of his service plan.

¶ 42 Based on these facts, the circuit court determined that the State proved by clear and convincing evidence that Father failed to maintain a reasonable degree of interest, concern, or responsibility as to Ethan's welfare. This finding is not against the manifest weight of the evidence.

¶ 43 Father also argues that the circuit court erred in finding that he did not make reasonable progress toward the return of the minor to the parent during any nine-month period following the adjudication of neglect. Reasonable progress is judged by an objective standard based on the amount of progress measured from the conditions existing at the time custody was taken from the parent. *In re Daphnie E.*, 368 Ill. App. 3d at 1067. At a minimum, reasonable progress requires measurable or demonstrable movement toward the goal of reunification, and reasonable progress

15

exists when the circuit court can conclude that it will be able to order the child returned to parental custody in the near future. *In re Daphnie E.*, 368 Ill. App. 3d at 1067. However, a parent does not have an unlimited amount of time to make reasonable efforts or progress toward the return home of his children. *In re Grant M.*, 307 Ill. App. 3d 865, 871 (1999).

¶ 44    The evidence offered at the fitness hearing showed that Father failed to make reasonable progress toward the goal of return home. Ethan was brought into care due to environmental concerns, which was of great importance due to his health. The condition of the home continued to be an issue throughout the case. While some repairs were made and problems corrected, the home continued to have new issues as the case progressed. The home had unsafe electrical outlets, numerous instances of bug infestations, choking hazards, and issues with unsafe animals being present in the home and poorly taken care of as well. Briscoe's testimony established that the home caused Ethan to fall ill on more than one occasion, thus indicating that the home was not a safe and sanitary environment for him. Father claims that the house is now safe, but never rescheduled a home check after cancelling twice, and this claim cannot be verified.

¶ 45    Based on these facts, the circuit court determined that the State proved by clear and convincing evidence that Father failed to make reasonable progress during the nine-month periods specified by the circuit court. Accordingly, we conclude that the circuit court's finding that Father was unfit was not against the manifest weight of the evidence.

¶ 46                                C. Best Interests

¶ 47    Once a parent has been found unfit, the focus shifts from the parent to the child. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 73. During the best interest phase, the parent's interest in maintaining a relationship with the child "must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004).

16

¶ 48　In deciding whether termination of parental rights is in a child's best interests, the circuit court must consider several statutory factors, including (1) the child's physical safety and welfare; (2) the child's sense of attachment; (3) the need for permanence and stability and the continuity of the child's relationships with parental figures, siblings, and other family members; and (4) the preferences of the individuals available to provide care. 705 ILCS 405/1-3(4.05) (West 2024). The circuit court may also consider the likelihood of the child being adopted. *In re Za. G.*, 2023 IL App (4th) 220793, ¶ 54. Although the circuit court must consider all applicable statutory factors, it is not required to refer to each individual factor in rendering its decision. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.

¶ 49　The evidence presented at the best interests hearing was more than sufficient to support the circuit court's finding that termination of Father's rights was in Ethan's best interest. Ethan never lived with Father. Upon being discharged from the hospital after birth, Ethan was placed with his current foster mom in December 2021. Briscoe observed a strong bond between Ethan and his foster mom, who Ethan calls "mom," and he was reported to have strong relationships with his other family members. Ethan has many medical issues, and while they have improved over time, his foster mom has taken him to all of his appointments, treatments, and to see numerous specialists. She is very familiar with his medical needs and has supported him throughout the entirety of his life so far. Ethan also attends a Head Start program and has many friends in his social life. He is happy and well-adjusted in his foster home.

¶ 50　We find that the State proved by a preponderance of the evidence that termination of Father's parental rights was in Ethan's best interest. The opposite conclusion is not clearly evident. As such, the circuit court's termination of Father's rights was not against the manifest weight of the evidence.

¶ 51                                    III. CONCLUSION

¶ 52    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 53    Affirmed.