NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 251290-U

NO. 4-25-1290

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 12, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| In re A.R., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Tazewell County |
| Petitioner-Appellee, | ) | No. 23JA76 |
| v. | ) | |
| Desiree D., | ) | Honorable |
| Respondent-Appellant). | ) | Katherine G. P. Legge, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Presiding Justice Steigmann and Justice Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*: Appellate counsel's motion to withdraw is granted and the trial court's judgment terminating respondent's parental rights to her child is affirmed.

¶ 2    Respondent, Desiree D., appeals the trial court's termination of her parental rights to her minor child. On appeal, respondent's appellate counsel has filed a motion to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), and *People v. Jones*, 38 Ill. 2d 384 (1967), asserting respondent can present no meritorious issues for review. We grant appellate counsel's motion and affirm the court's judgment.

¶ 3                                    I. BACKGROUND

¶ 4    Respondent and Daniel R. are the parents of one child, A.R. (born in March 2023). In May 2023, an investigator with the Illinois Department of Children and Family Services (DCFS) filed a petition, alleging A.R. was a neglected and abused minor under the Juvenile Court Act of

1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2022)) and that it was in A.R.'s best interest to be placed in shelter care and made a ward of the court. The petition alleged A.R. came to the attention of DCFS after his parents sought medical treatment for him in the weeks following his birth and A.R. was found to have unexplained injuries that the evaluating doctor suspected were the result of "child physical abuse," including frenulum tears, upper lip bruising, and a left subconjunctival hemorrhage.

¶ 5 In July 2023, the trial court entered an adjudicatory order finding A.R. was neglected and abused as alleged in the petition. It also entered its dispositional order, adjudicating A.R. neglected and abused, making him a ward of the court, and placing him in the custody and guardianship of DCFS.

¶ 6 In February 2025, the State filed a petition to terminate respondent's parental rights to A.R. (The record shows the State also sought to terminate Daniel's parental right to A.R. and was successful; however, only respondent is a party to this appeal and, therefore, we address the facts and issues solely as they relate to her). The State alleged respondent was unfit to parent A.R. under section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2024)) because she failed to make reasonable progress toward A.R.'s return to her care during the nine-month period extending from April 30, 2024, to January 31, 2025. It further asserted that termination of respondent's parental rights was in A.R.'s best interest.

¶ 7 In October 2025, the trial court conducted a fitness hearing on the State's petition. The State presented testimony from Tiffany Chandler, who worked for the Center for Youth and Family Solutions (CYFS) and was respondent's caseworker from April to October 2024. Chandler stated that in July or August 2024, respondent moved to her mother's home in East Peoria, Illinois. That location was not an appropriate home for A.R. because respondent's mother had previous

involvement with DCFS. In September 2024, respondent moved to Iowa with a "[p]revious boyfriend."

¶ 8        Chandler testified that in June 2024, respondent completed a substance abuse evaluation, resulting in a recommendation that she to undergo "intensive outpatient" services. Although Chandler spoke with respondent about the importance of drug treatment, respondent refused the recommended services.

¶ 9        On cross-examination, Chandler testified that respondent reported her move to Iowa but advised that such a move "probably was not the brightest idea at that point." Between April and October 2024, respondent worked at Walmart and had insurance through her employer. Because respondent's insurance provider would not pay for her substance abuse assessment, CYFS paid for the assessment.

¶ 10        As part of its case, the State asked the trial court to take judicial notice of certain pleadings and prior orders in the case. It also presented exhibits that included (1) respondent's drug "drop records" from June 2024 to January 2025, (2) a report detailing a psychological evaluation performed on respondent by Dr. Nikki Hernandez in November 2024, (3) a CYFS case note from January 27, 2025, and (4) respondent's drug and alcohol evaluation at the Addiction Recovery Center at Carle Health Proctor Hospital. The exhibits showed that respondent reported daily marijuana use and repeatedly tested positive for marijuana on drug tests between June 2024 and January 2025. Dr. Hernandez diagnosed respondent with "Borderline Intellectual Functioning" and "Mild Cannabis Use Disorder" and recommended that she abstain from using marijuana. Finally, the CYFS case note showed a caseworker visited respondent's residence on January 27, 2025. The caseworker noted the presence of several pets at the home, the home smelled of feces and needed repairs, and respondent had pill bottles with medication that were not properly stored

and left on a living room table.

¶ 11    At the fitness hearing, respondent testified on her own behalf and indicated she had difficulty engaging in substance abuse treatment during the fall of 2024 because of insurance issues. On cross-examination by the guardian *ad litem* (GAL), respondent agreed that from April 2024 to January 2025, she did not complete substance abuse treatment in either Illinois or Iowa. On redirect examination, respondent maintained that she had tried to engage in such treatment.

¶ 12    Respondent also called Dedra Williams as a witness. Williams, who was respondent's caseworker from November 2024 to January 2025, testified that respondent reported her move to Iowa and completed a psychological evaluation with Dr. Hernandez. On examination by the trial court, Williams asserted that by the end of January 2025, respondent was not "closer to a return home" for the minor. She also stated that she was not able to increase respondent's visits with A.R. On redirect examination, Williams testified CYFS was unable to find a substance abuse provider for respondent in Iowa. Finally, on cross-examination by the State, Williams confirmed that respondent "also said she was not going to do treatment."

¶ 13    The trial court took the matter under advisement. On October 31, 2025, the court issued its oral ruling, finding the State proved by clear and convincing evidence that respondent failed to make reasonable progress toward A.R.'s return to her care during the relevant nine-month period. The court determined the evidence was uncontroverted that respondent was not "any closer to a return home" by the end of the relevant nine-month period. Additionally, it stated it "found credible" the testimony from respondent's caseworkers that respondent refused substance abuse treatment and noted that such treatment was a significant part "of [respondent's] care plan." The court entered its written order the same day, finding the State proved respondent unfit as alleged in its petition. In setting forth its ruling, the court stated it found "that the caseworkers['] testimony

was very credible," respondent's testimony "was not credible," and respondent "made a choice not to complete services."

¶ 14 In November 2025, the trial court conducted the best-interest hearing. The court noted that it had received and reviewed the best-interest report, filed on November 17, 2025. The report showed that A.R. had resided in the same foster home since being taken into care in May 2023, when he was eight weeks old. The home included A.R.'s foster mother and father and their teenage son. The foster home was described as "a fictive kin" placement that shared familial ties with A.R. The report also stated that A.R. had "a secure bond" with his foster family and "a sense of security and safety" in his foster home. According to the report, A.R.'s foster parents provided him "with a nurturing and safe environment" and had the desire to provide A.R. with permanency through adoption.

¶ 15 At the hearing, Williams testified for the State that she had authored the best-interest report and it was her opinion that respondent's parental rights should be terminated. Williams had observed A.R. with his foster family and stated that there was a "loving bond" between them. She also believed that the foster family was "the best course" for permanency for A.R.

¶ 16 On cross-examination, Williams testified that she had been respondent's caseworker for one year and, during that time, respondent resided in Iowa. In October 2025, after the fitness hearing, respondent was referred for a substance abuse evaluation. Williams agreed that respondent was not previously referred for substance abuse services while living in Iowa, and she testified that respondent had "just started" engaging in such services.

¶ 17 Williams also testified that respondent received two visits a month with A.R., which respondent attended. Williams observed some of the visits and agreed that they were "appropriate."

During visits, respondent would feed A.R., play with him, and change his diaper. Williams testified that A.R. called both respondent and his foster mother " 'mom.' " However, she stated she was unsure whether A.R. knew respondent was his mother because sometimes he did not "address her at all."

¶ 18 On cross-examination by the GAL, Williams asserted that A.R. would "parallel play[ ]" during visits with respondent. She explained that because A.R. was two years old, he did not listen very well and did what he wanted during visits. Respondent struggled with redirecting A.R. and getting his attention. Williams stated that, "normally," A.R. did not "reach out to [respondent] to instigate anything."

¶ 19 Williams further described an incident that occurred after the prior hearing in the case. She stated respondent got "in [her] space" and screamed at her for several minutes, "blam[ing] [Williams] for the way the hearing went." According to Williams, security told respondent to "quiet down" or she would have to leave, and respondent "just left." Williams stated that respondent "appear[ed] to have a temper a lot" and noted that respondent would also get "frustrated" when A.R. would not listen. Williams asserted that A.R. was well-behaved in his foster home and that he listened to his foster parents, noting A.R. "seemed comfortable" and "calmer" in his foster home.

¶ 20 On redirect examination by the State, Williams testified that A.R. did not "really reach out to" respondent; however, she did see A.R. "reaching out to" his foster parents. She also stated that she observed a "healthy bond" between A.R. and his foster parents, especially with his foster father.

¶ 21 Respondent testified on her own behalf that A.R. "seemed joyful" during their visits and "like a happy boy." She described their visits, including the toys that A.R. liked to play with,

the activities they did together, and the food she would bring for A.R. to eat. Respondent expressed that she loved A.R. and stated she engaged in substance abuse services after the fitness hearing because she had "a future" and was not "going to give up."

¶ 22    Ultimately, the trial court determined that termination of respondent's parental rights was in A.R.'s best interest. It found A.R. was well taken care of in his foster home and that his needs were being met. The court pointed out that A.R. had been in the same foster placement since he was approximately two months old and that it appeared he had "a strong sense of attachment there." It further noted that the foster home was a fictive kin placement and found the evidence supported the conclusion that A.R. had a stronger bond with his foster parents than he did with respondent. Finally, the court also relied on A.R.'s need for permanence and stability and stated that it still had "concerns" regarding respondent's behavior, noting her angry outburst directed at the caseworker and continued substance abuse. On November 26, 2025, the court entered its written order, terminating respondent's parental rights.

¶ 23    This appeal followed.

¶ 24                                II. ANALYSIS

¶ 25    As stated, on appeal, respondent's counsel has filed a motion to withdraw, asserting "an appeal in this case would be meritless." See *In re S.M.*, 314 Ill. App. 3d 682, 685 (2000) (providing that "[t]he procedure for appellate counsel to withdraw as outlined in *Anders* applies to findings of parental unfitness and termination of parental rights"). To his motion, respondent's counsel has attached a memorandum of law, asserting the trial court's unfitness and best-interest determinations were supported by the record and that there were no irregularities or errors in the termination proceedings that would provide meritorious grounds for appeal. Service of the motion on respondent has been shown. Additionally, this court granted respondent leave to file a response

- 7 -

to counsel's motion to withdraw on or before February 18, 2026, but she has not responded. After reviewing the record, we agree with appellate counsel and find respondent's appeal presents no meritorious issues for review.

¶ 26                                      A. Fitness

¶ 27        Section 29-2 of the Act (705 ILCS 405/2-29(2) (West 2024)) provides for a two-step process for the involuntary termination of parental rights. *In re M.I.*, 2016 IL 120232, ¶ 20. The first step requires that a trial court find, by clear and convincing evidence, that a parent is unfit as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). *M.I.*, 2016 IL 120232, ¶ 20. Under the second step, the court considers whether termination is in the child's best interest. *Id.*

¶ 28        On review, the trial court's finding of parental unfitness will not be disturbed unless it is against the manifest weight of the evidence. *Id.* ¶ 21. A court's decision "is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent." (Internal quotation marks omitted.) *Id.*

¶ 29        Here, the State alleged respondent was unfit under section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2024)). Under that section, a parent is unfit for failing "to make reasonable progress toward the return of the child to the parent during any [nine]-month period following the [neglect or abuse] adjudication." *Id.* In this case, the State specifically alleged that respondent failed to make reasonable progress toward A.R.'s return to her care between April 30, 2024, and January 31, 2025.

¶ 30        "Reasonable progress is an objective review of the steps the parent has taken toward the goal of reunification and examines the demonstrability and quality of those steps." *In re Dar. H.*, 2023 IL App (4th) 230509, ¶ 53. "Reasonable progress exists when the trial court can

conclude that, in the near future, it will be able to order the [child] returned to parental custody." *Id.*

> "[T]he benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001).

¶ 31 Here, evidence presented at the fitness hearing supported the trial court's finding that respondent failed to make reasonable progress toward A.R.'s return to her care between April 2024 and January 2025. Specifically, evidence showed that respondent's recommended services included participation in substance abuse treatment. Additionally, the doctor who performed respondent's psychological evaluation recommended that respondent stop using marijuana. However, evidence showed respondent refused to participate in substance abuse services and continued her marijuana use, repeatedly testing positive for marijuana on all her drug tests between June 2024 and January 2025. During the relevant nine months, respondent also moved to her mother's residence, which was not an appropriate home for A.R. She then moved out of state against the recommendation of her caseworker. By the end of the relevant nine-month period, respondent was no closer to having A.R. returned to her care.

¶ 32 As argued by respondent's appellate counsel, the record shows the trial court utilized the correct legal standard, finding the State had proved respondent unfit by clear and convincing evidence. The court's decision was supported by the record and not against the manifest weight of the evidence. Accordingly, we agree that respondent can raise no meritorious

claim on appeal that the court erred in finding her unfit.

¶ 33                                    B. Best Interest

¶ 34          At the best-interest stage of termination proceedings, "the trial court must give full and serious consideration to the child's best interest." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009). The State has the burden of proving that termination is in the minor's best interest by a preponderance of the evidence. *In re D.T.*, 212 Ill. 2d 347, 366 (2004). Further, the Act sets forth various factors for a trial court to consider when making a best-interest determination. See 705 ILCS 405/1-3(4.05) (West 2024). Those factors, which must be considered in the context of the child's age and developmental needs, include (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence; (8) the uniqueness of every family and child; (9) the risks attendant to substitute care; and (10) the preferences of the persons available to care for the child. *Id.*

¶ 35          "The trial court's best-interest determination will not be disturbed on appeal unless it is against the manifest weight of the evidence." *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 74. "A best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate that the trial court should have reached the opposite result." *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53. Additionally, "[w]e afford great deference to the court's determination, as it is in the best position to view the witnesses and judge their credibility." *Baby Boy*, 2025 IL App (4th) 241427, ¶ 74.

¶ 36          Here, evidence at the November 2025 best-interest hearing showed A.R. had been in the same foster home since May 2023, when he was eight weeks old. He was well cared for in

the home, and his needs were being met. A.R. was described as having a strong bond with his foster family, and his foster parents had expressed the desire to adopt him. Although respondent loved A.R. and regularly attended visits with him, she failed to participate in and complete all her required services and was unlikely to have A.R. returned to her care in the foreseeable future.

¶ 37　　　　The record shows the trial court considered the evidence presented, along with the relevant best-interest factors. Its finding that termination of respondent's parental rights was in A.R.'s best interest was supported by the record and not against the manifest weight of the evidence. Again, we agree with appellate counsel that respondent can raise no meritorious claim that the court erred in finding that termination of her parental rights was in A.R.'s best interest.

¶ 38　　　　　　　　　　　　III. CONCLUSION

¶ 39　　　　For the reasons stated, we grant appellate counsel's motion to withdraw and affirm the trial court's judgment.

¶ 40　　　　Affirmed.